ARK. POWER & LIGHT CO. *v.* ARK. PUBLIC SERVICE
COMMISSION ET AL.

5-1940                                    330 S. W. 2d 51

Opinion delivered November 2, 1959.

[Rehearing denied January 11, 1960]

*House, Holmes, Butler & Jewell,* for appellant.

*Tom Gentry,* for appellee.

SAM ROBINSON, Associate Justice.   The United
States Government purchased several thousand acres
in Pulaski County to be used· as an Air Force Base.
Prior to this purchase by the Government, the right to
sell electricity in a portion of the area had been allo-
cated to the First Electric Cooperative Corporation,
hereinafter called the Co-op, and the right to sell elec-
tricity in the other portion had been allocated to
the Arkansas Power & Light Company, hereinafter
called the Power Company.   After the Government ac-
quired the land it required the Co-op and the Power

Company to remove all their electrical equipment of every kind and description from the area and paid them for doing so. Subsequently the Government constructed on the property an electrical distribution system that it owns and operates. In 1954 the Government contracted with the Power Company for the purchase by the Government of electricity to be used at the Air Base. The electricity is supplied by the Power Company at its substation located in an area previously allocated to it by the Public Service Commission and adjacent to the Air Base property.

In 1957 the Government began construction of several hundred housing units for Air Force personnel. Some of these houses are located in the area formerly supplied with electricity by the Co-op before the Air Base was established, and part were constructed in the area which had been supplied by the Power Company under the allotment made before acquisition of the land by the Government. The Government uses electricity obtained under a 1957 supplemental contract with the Power Company to supply all the housing units within the Air Base area.

This litigation was started when the Co-op filed a complaint with the Arkansas Public Service Commission asking that the Power Company be ordered to cease and desist from furnishing electric power to the Government to be used in supplying the Government housing units located in that part of the Air Force Base which had been serviced by the Co-op before acquisition of the property by the Government. Of course, the effect of such an order would be to enable the Co-op to supply electricity to the area mentioned. The Commission in effect granted the petition but attempted to simplify the matter by ordering the Power Company to meter separately the electricity going into that part of the housing units located on property formerly supplied by the Co-op and to settle with the Co-op by charging it at the rate it pays the Power Company for electricity and giving it credit for the price received from

the Government. A meter or meters would have to be installed on Government property and made a part of the Government distribution system. Such an arrangement would give the Co-op a handsome profit without any investment whatever on its part. It was shown that the Power Company has spent several hundred thousand dollars to enable it to supply electricity to the Air Base. The circuit court affirmed the order of the Commission.

The real question is whether the Public Service Commission has authority to force the Government to buy electricity from the Co-op, for such is the effect of the order. The Government wanted to construct in the area its own electrical distribution system. The Power Company and the Co-op were required to remove their equipment from the property. In contracting with the Power Company for electricity, the Government required the Company to provide certain facilities to guarantee as nearly as possible an uninterrupted supply of electricity. The Government then tied its facilities in to those constructed by the Power Company. It was shown that the Government initiated the negotiations with the Power Company to purchase electricity. A fair abstract of the testimony of Mr. H. F. Minnis, Vice-President of the Power Company, on this point, as prepared by appellant, is as follows:

"The negotiations first started on February 5, 1953 when the Corps of Engineers came to us about relocation or removal of our existing facilities in the Air Base area and the possible relocation of our 115 kv transmission line. That was all consummated by the Corps of Engineers, but later on February 25, 1953 Colonel Ben Harvey of the Corps of Engineers asked our Company for a conference with reference to a power supply. The government solicited us to furnish the power supply and set a tentative date for a conference on October 8, 1953. On that date we had a meeting and went into all requirements upon the power supply. In these negotiations the government laid down specifications as to

the material and kind of power it would need to serve the Air Base and the type of load it would be. They requested a source of power from our transmission system and that the sub-station be located adjacent to the Air Base property but not on it. They requested that the service be metered and the point of delivery be at the south boundary line of the Air Force property so that from that location the Air Force would build its entire distribution system to serve the requirements of the Air Base . . .

"We built a 115 kv transmission line adjacent to the south border of the Air Base property fed directly from our 115 kv transmission system, that is energized from two ways so that they could have continuous service so far as primary distribution voltage was concerned. In order to do that we built a new transmission line from Little Rock to Jacksonville completely shielded up to this sub-station site and put in an oil circuit breaker that would protect the rest of the line towards Newport so if there was a fault beyond Jacksonville to Newport it would not affect the Air Base. The contract was reduced to writing as to the electric service specifications in which the Government stated the amount of capacity and energy they wanted and the delivery voltage. The contract provides that the premises to be served is the Little Rock Air Force Base. The electric service specifications are on page 10 of the contract, showing 7,500 kilowatts estimated maximum demand and 32,400 kilowatts estimated annual consumption. It provides that the point of delivery of service should be at the Base boundary as shown on Exhibit D to the contract. Exhibit A to the contract, or the specifications of the sub-station we were required to furnish the government, consists of a schematic diagram which shows exactly how to build the station and shows the point of delivery and that the government would have as near a continuous source of supply as possible. From the point of delivery to the south boundary indicated on Exhibit A to the contract, the government built their entire distribution system to serve the whole Air Base.

On the map introduced in evidence the sub-station site is shown in Section 18 adjacent to the south boundary of the Base and is shown as a small green square south of the Air Base boundary. The 115 kv line is fed from two ends and originated at the Dixie substation at one end and the Newport sub-station at the other. We built an entirely new line from the Dixie sub-station to the Air Base. I don't know the exact cost of the construction, but I judge it is approximately ten miles and costs about $25,000 a mile so it is approximately $250,000. It is a heavy line, big conductor, completely shielded.

"Our sub-station was built according to government requirements, and the line was built according to government requirements set forth in the contract. The government gets transmission line connection at our sub-station right at the terminus of the new line which we built from the sub-station. On towards Newport the old line goes in and that is the reason they insisted we put an oil circuit breaker there so if there is a fault between the sub-station and Newport, it would not interrupt service to the Air Base. All of this was done to meet requirements of the United States. Cost of the sub-station was negotiated, and the government paid approximately three-fourths of it and the power company paid the other one-fourth less any salvage we might get if the government discontinues service. It resolves itself down into a connection charge of $85,860, and this is detailed in the contract.

"Under the terms of our agreement with the government they will get back the connection charge in electricity as we give them credit for ten per cent of the monthly billing until they recover their money. I am familiar with the government's distribution system within the Base and have been over it. From the point of delivery at our sub-station the government built two circuits of heavy conductors, about 500,000 circular mills aluminum to a switching station, which is about three-fourths of a mile northwest from the sub-station

in the Air Base. From there it goes into the switching station, and they installed three circuit breakers. From these circuit breakers go three different 13 kv lines that radiate out over all the Air Base property on which are installed air break switches which permit the government to sectionalize any part of these feeder circuits and operate them as a loop. Where they have a small lateral over one of these big feeder circuits they have installed fuse switches so if there is a fault on one of the small laterals it does not interfere with service from the main feeder and if there is a fault on the feeder circuit they can sectionalize it quickly and feed the rest of the area from the other circuits. To protect it from lightning, which is quite a problem, they shielded their feeder circuit just as we shielded our 115 kv line. Their whole grid system of distribution voltage, except for some laterals, which are not complete, is shielded. The government's entire system at the Air Base is what is ordinarily known as a loop system, and you can get service three ways from almost any portion of it. This was done to preserve the continuity of service as far as is possible."

Although it does not appear that the United States has acquired jurisdiction pursuant to Title 40, § 255, USCA in the circumstances of this case the Power Company cannot be prevented from selling electricity to the Government for use over the entire area of the Air Base. The Air Base is a facility established for a national purpose. In the case of *Public Utilities Commission of California* v. *U. S.*, 355 U. S. 534, 2 L. Ed. 2d 470, 78 S. Ct. 446, the principle was reiterated by the United States Supreme Court that state laws or their administrators cannot interfere with the carrying out of a national purpose. There the court held invalid a state statute authorizing the state commission to approve rates charged by common carriers to the United States as being an unlawful interference with the activities of the Federal Government. If a state cannot regulate the rates a utility charges the Federal Government, then it is hard to understand how the commis-

sion can enjoin the utility company from furnishing all the service the Government requires.

In 1958 an issue almost identical with the one in the case at bar was before the North Dakota Public Service Commission. *Re Souris River Telephone Mutual Aid Corp.*, 24 P. U. R. 3d 84. There the question was whether the public service commission should revoke a certificate of convenience and necessity theretofore granted to the Northwestern Bell Telephone Company and grant such a certificate to the Souris River Telephone Mutual Aid Corporation. The commission held that it had no authority to dictate to the Government as to the persons or corporations with which it should contract for utility facilities. In that case it was said: ''The thing to be remembered is that the responsibility for this decision [the obtaining of utility facilities] is with the Secretary of the Air Force and no one else. If it was to be said that a company not having an established service area must obtain a certificate from the commission before it can enter into a contract with the secretary, then it follows that the commission would also have the power to deny the company such authority and thus directly interfere with the discretion vested by Congress in the federal officer. The federal statute does not require that the company with whom the secretary desires to contract also obtain a certificate of authority from a state commission and if Congress had intended such to be the case it would have so stated.'' The Commission was referring to USCA, Title 50, § 491, but Title 10, § 9773 is equally applicable. It provides: ''The Secretary of the Air Force shall determine the sites of such additional permanent air bases and depots in all strategic areas of the United States and the Territories, Commonwealth, possessions, and holdings *as he considers necessary.* He shall also determine when the enlargement of existing air bases and depots is necessary and for the effective peacetime training of the Air Force. . . . At each Air Base or depot established under this section the Secretary shall remove or remodel existing structures as neces-

sary; do necessary grading; and provide buildings, *utilities,* communication systems, landing fields and mats, roads, walks, aprons, docks, runways, facilities for the storage and distribution of ammunition, fuel, oil, necessary protection against bombs, and all appurtenances to the foregoing. . . ." (Emphasis supplied)

In *Johnson* v. *Maryland,* 254 U. S. 51, 65 L. Ed. 126, 41 S. Ct. 16, Mr. Justice HOLMES quoted from *Osborn* v. *Bank of U. S.,* 9 Wheat. 738, 867, 6 L. Ed. 204, as follows: "Can a contractor, for supplying a military post with provisions, be restrained from making purchases within any state, or from transporting the provisions to the place at which the troops were stationed? Or could he be fined or taxed for doing so? We have not yet heard these questions answered in the affirmative."

And in the *Osborn* case the court goes on to say: "It is true, that the property of the contractor may be taxed, as the property of other citizens . . . But we do not admit that the act of purchasing, or of conveying the articles purchased, can be under state control." Likewise, in the case at bar the Public Service Commission cannot designate the utility company from whom the Government must purchase electricity, nor can the Commission dictate the area of Government owned property in which the Government must use the electricity it has purchased.

The Co-op argues, also, that under the terms of the contract between the Power Company and the Government, regulations adopted by the Public Service Commission shall prevail. The contract provision in question is as follows:

"5. PUBLIC REGULATION AND CHANGE OF RATES. (a) Public regulation. Service furnished under this contract shall be subject to regulation in the manner and to the extent prescribed by law by any Federal, State, or local regulatory commission having jurisdiction. If during the term of this contract the public regulatory commission having jurisdiction receives

for file in authorized manner rates that are higher or rates that are lower than these stipulated herein for like conditions of service, the Contractor agrees to continue to furnish service as stipulated in this contract and the Government agrees to pay for such service at the higher or lower rates from and after the date when such rates are made effective.''

Disregarding the question of whether the Co-op can properly invoke a provision of the contract between the Government and the Power Company, the above quoted provision of the contract appears to apply only to rates. But in any event, it is not subject to the construction that the Government cannot do the principal thing it was seeking to do, and that was to buy electricity from the Power Company for use on the entire Air Base.

Reversed, with directions to dismiss the complaint.

HARRIS, C. J., and WARD and JOHNSON, JJ., dissent.

CARLETON HARRIS, Chief Justice, dissenting.

My dissent in this matter is based purely and simply upon the provisions of Section 5 of the contract No. DA-03-050-eng-2399, between the United States of America and the Arkansas Power & Light Company, dated February 19, 1954. Section 5 provides as follows:

''5. PUBLIC REGULATION *AND*[1a] CHANGE OF RATES

(a) Public regulation. *Service furnished under this contract shall be subject to regulation in the manner and to the extent prescribed by law by any Federal, State, or local regulatory commission having jurisdiction.*[1b] If during the term of this contract the public regulatory commission having jurisdiction receives for file in authorized manner rates that are higher or rates that are lower than these stipulated herein for like conditions of service, the contractor agrees to continue to furnish service as stipu-

---

[1a] and [1b]. Emphasis supplied.

lated in this contract and the government agrees to pay for such service at the higher or lower rates from and after the date when such rates are made effective.''

To me, the underscored language indicates clearly that the Government voluntarily subjected itself to the regulations of the Public Service Commission, and inasmuch as the Commission's holding was based upon substantial evidence, was not arbitrary, and in my view, entirely lawful, I would affirm.

PAUL WARD, Associate Justice, dissenting.

There is nothing in the record in this case to show that the United States Government cared which Company furnished its electricity, but, as pointed out in another dissent, the record does show that it was willing to abide by State regulations. This, I submit, is the reasonable and sensible attitude that the Government should have taken —and did in fact take.

It is apparent to me that this case is before us now in its present status simply because appellant contracted with the Government before the question here involved could be raised. Putting it another way, it appears that appellant never disclosed to the Government that any question of assignment of territory might be involved. On this point consider the testimony of appellant's Vice-President:

''Q. The question that I asked you is this: Did you tell the government at the time that they contacted you concerning the power for the Air Base that you did not have a Certificate of Public Convenience and Necessity to serve the entire Air Base?

A. In the negotiation the Government gave us the point of delivery they wanted. We looked at that and saw that it was in an area that was allocated to the Arkansas Power and Light.

Q. Now then, answer my question. Did you tell them the First Electric Cooperative had a Certificate of Public Convenience and Necessity to serve the area?

A. Did I tell them?

Q. Yes, sir.

A. No, sir, I did not.

\* \* \*

Q. Do you know of your own knowledge, Mr. Minnis, whether or not the Contracting Officer had any idea who had the right to serve that territory under a Certificate of Convenience and Necessity from this Commission?

A. I think I know the Contracting Officer had the right to sell the service at the point he sold it and I think he knew the U. S. Government can do what they dern please with it after they get it.

Q. That is not the question I asked you and I am going to stay here all day until I get an answer to my question if the Commission will permit me. My question was: You did not know whether or not the Contracting Officer knew that the First Electric Cooperative had a right to serve a part of that territory at that time when you entered into the contract, do you?

A. I don't think these Contracting Officers are dumb. We have dealt with them a lot of times and they knew all about their business in a big way and they came in with their requirements and we met them on that basis.

Q. And you did not tell them that you did not have a Certificate of Necessity to serve all the territory in the Air Base?

A. We have a certificate to serve the Base at the place we did serve it and he knows that.

Q. But you did not tell him that you did not have a Certificate of Public Convenience and Necessity to serve all of the Air Base, did you?

A. It was not necessary from our standpoint.

Q. You did not do it whether it was necessary or not, did you? Why are you so reluctant to answer?

A. Because we did not try to tell the Government how to run their business.

Q. Just answer my question, did you or did you not?

A. They asked us for a point of delivery and it was at a place we had a right to serve. We sold it there and took it from there.

Q. You did not tell them?

A. I told them just exactly what I told you.

Q. And that was no, I believe you said.

A. Sir?

Q. That was no.

A. I said we had a right to serve at the place we did serve and they took it from there.''

JIM JOHNSON, Associate Justice, dissenting.

In respectfully dissenting to the majority opinion, I want to state at the outset that I do not disagree with any of the cases cited therein. The cases, as I view them, simply do not touch top, side nor bottom the issues involved in this lawsuit. This dissent is based wholly upon the clear language of Section 5 of the contract between the United States and the Arkansas Power & Light Company. This section is headed: ''Public Regulation and Change of Rates.'' The title alone shows that two subjects are covered in Section 5: (1) Public Regulation; and (2) Change of Rates. The first sentence in Section 5 is as follows:

''Service furnished under this contract shall be subject to regulation in the manner and to the extent prescribed by law by any Federal, *State,* or local regulatory commission having jurisdiction.'' (Emphasis supplied)

I can place only one interpretation upon this sentence and that is the United States voluntarily submitted to the regulations of the commission having jurisdiction. In

reading Section 5 and the contract in its entirety I am unable to find one word indicating that it was the intention of the United States to limit the jurisdiction to which it voluntarily submitted to rates alone. Section 5, as I see it, (1) submits the United States to general public utility regulation, including (2) regulation of rates.

It must be conceded that under our law the Public Service Commission is the "regulatory commission having jurisdiction." This being true, I can see no good reason for abandoning our well settled rule that we only review the following four questions on appeals from the Public Service Commission:

1. Is the Commission's order supported by substantial evidence?

2. Is the Commission's order free from fraud?

3. Is the Commission's order arbitrary?

4. Does the order of the Commission violate any right of the appellant under the United States or State Constitutions? See: *Inc. Town of Emerson* v. *Ark. Public Service Commission,* 227 Ark. 20, 295 .S. W. 2d 778.

Nowhere in the record is it seriously indicated that any of the above questions could be answered in the affirmative. In fact, I am convinced that the Commission's Order is the only logical conclusion that could possibly be reached in this case under the circumstances. The United States indicated its recognition of the clear terms of its contract by its failure to intervene in this lawsuit. The majority opinion, in effect, is saying that this does not matter; Arkansas Power & Light Company is entitled to all the privileges and immunities of the United States Government, yea even entitled to rights that the Government itself is not claiming. The states of this Union have already, voluntarily or otherwise, relinquished too many rights to the central Government without our forcing upon a contractor with the Government rights which the

Government has voluntarily relinquished to our State utility regulatory authority.

For the reasons stated above, I respectfully dissent.