BLACK HILLS POWER AND LIGHT COMPANY, A South Dakota Corporation, Appellant,

v.

Caspar W. WEINBERGER, as Secretary of the Department of Defense; Department of Defense, an agency of the United States of America; Richard D. Rasmussen, as contracting officer for Ellsworth Air Force Base, a defense installation under the control of the Department of Defense; Heartland Consumers Power District, a subdivision of the State of South Dakota; West River Electric Association, Inc., a South Dakota rural electric cooperative; and the Public Utilities Commission, a regulatory commission of the State of South Dakota, Appellees.

BLACK HILLS POWER AND LIGHT COMPANY, Appellant,

v.

HEARTLAND CONSUMERS POWER DISTRICT, Ellsworth Air Force Base, United States of America, Appellees. (Two Cases)

BLACK HILLS POWER AND LIGHT COMPANY, A South Dakota Corporation, Appellee,

v.

Caspar W. WEINBERGER, as Secretary of the Department of Defense; Department of Defense, an agency of the United States of America; Richard D. Rasmussen, as contracting officer for Ellsworth Air Force Base, a defense installation under the control of the Department of Defense; Heartland Consumers Power District, a subdivision of the State of South Dakota; West River Electric Association, Inc., a South Dakota rural electric cooperative; and the Public Utilities Commission, a regulatory commission of the State of South Dakota, Appellant.

BLACK HILLS POWER AND LIGHT COMPANY

v.

HEARTLAND CONSUMERS POWER DISTRICT, Ellsworth Air Force Base, United States of America. (Two Cases)

Nos. 85–5418, 85–5428.

United States Court of Appeals, Eighth Circuit.

Submitted June 9, 1986.

Decided Jan. 7, 1987.

Rehearing and Rehearing En Banc Denied Feb. 4, 1987.

David E. Morrill, Rapid City, S.D., for appellant.

Mary L. Vanderpan, Pierre, S.D., for State of S.D./Public Utilities.

Drake Cutini, Washington, D.C., for Weinberger.

Vincent J. Protsch, Howard, S.D., for Heartland.

Before JOHN R. GIBSON and MAGILL, Circuit Judges, and REGAN,[*] Senior District Judge.

JOHN R. GIBSON, Circuit Judge.

Black Hills Power and Light Company and the South Dakota Public Utilities Commission appeal from a judgment of the district court denying Black Hills' motion for a preliminary injunction and summary judgment and granting the United States' motion to dismiss. Appellants seek to have a contract for electric power entered into by Ellsworth Air Force Base and Heartland Consumers Power District declared void, and an order entered requiring Ellsworth to contract with Black Hills for the provision of such power. The central issue on appeal is whether Ellsworth Air Force Base must follow the utility franchise territories prescribed by South Dakota law in procuring its electrical service. We conclude that Ellsworth is a federal enclave under exclusive federal jurisdiction, that nothing in federal procurement law directs the Ellsworth contracting officials to follow state utility franchise law, and that none of the legislation enacted by Congress while this case was pending alters our analysis and decision. Therefore, we affirm the decision of the district court.[1]

Ellsworth Air Force Base is a military installation of the Department of Defense and is located in parts of Meade and Pennington Counties, South Dakota. It occupies 4,856.76 acres, of which approximately 88% (4,261.57 acres) has been ceded by South Dakota to the exclusive jurisdiction of the United States.

Black Hills is a South Dakota electric utility regulated by the South Dakota Public Utilities Commission. It provides electric service to the Renel Heights housing area located on Ellsworth's main base. This service amounts to approximately

---

[*] The HONORABLE JOHN K. REGAN, Senior United States District Judge for the Eastern District of Missouri, sitting by designation.

1. The Honorable Andrew W. Bogue, Senior United States District Judge for the District of South Dakota, Western Division.

5.3% of Ellsworth's total electrical consumption. Prior to 1984, the rest of the main base needs, over 94% of Ellsworth's total electric consumption, were supplied by the Western Area Power Administration (WAPA), an agency of the United States Department of Energy. At two housing sites not connected to the main base, electricity is provided by West River Electric Association, a South Dakota rural cooperative. West River's service provides only .6% of Ellsworth's total needs. With the exception of the Renel Heights housing area, all electrical distribution, transmission, transformation, and street lighting systems located on Ellsworth are owned, operated, and maintained by the United States. The Renel Heights electrical system is owned by Black Hills and is not compatible with the WAPA-owned electrical system.

In 1984, WAPA determined that it could no longer supply all of Ellsworth's main base needs; thus, Ellsworth would have to contract with another supplier for the additional power. The United States solicited bids and five suppliers, including Black Hills, submitted proposals. Ellsworth chose the lowest bid, that of Heartland Consumers Power District, a subdivision of the State of South Dakota. Heartland's proposal was $336,769.20 as compared to Black Hills' proposal of $614,381.19. The United States and Heartland entered into a one-year contract in October, 1984. On November 24, 1984, Black Hills filed a complaint with the South Dakota Public Utilities Commission arguing, among other things, that Ellsworth Air Force Base is located in Black Hills' utility service territory, and therefore Ellsworth is required to obtain electrical power beyond that supplied by WAPA from Black Hills.[2]

After a three day evidentiary hearing and a personal inspection of the Air Force base, the Commission issued its decision. It held that it had jurisdiction to determine who has the right to furnish electrical service to the base because, first, it has jurisdiction to determine retail service areas of electric utilities, see S.D. Codified Laws Ann. §§ 49–34A–42 to 49–34A–44 (1983), and, second, although it does not have jurisdiction over the operations at Ellsworth, it has jurisdiction over the utility companies to determine who has the right to furnish the base with electricity. PUC Decision at 8. In addition, since part of the base was not ceded to the United States, that part is under the Commission's jurisdiction, and "in order to control the delivery of electric power and energy which is commingled and served throughout the entire Base, it is necessary for the Commission to control the whole." *Id.* Furthermore, the Commission determined that it was not interfering with federal jurisdiction because Congress has preempted regulation only of wholesale sales of power and has left regulation of retail sales to the states. The Commission also decided that the federal procurement regulations direct federal procurement officers to abide by local franchise or service territories. Thus, the Commission concluded that federal law recognizes the Commission's jurisdiction to determine which electric utility has authority to deliver electric service to the base.

After deciding that it had jurisdiction, the Commission ruled that the sale of power to the United States is a retail sale, and Ellsworth is located primarily in Black Hills' service area. It concluded that, under South Dakota law, Black Hills is entitled to be the exclusive provider of electric service to Ellsworth for use at the base. *Id.* at 10. Because the 1984–85 contract was awarded to Heartland as the lowest bidder, the Commission also discussed issues pertaining solely to Heartland's authority under state law to provide electric service to the base. However, the one-year contract beginning in October, 1986, was granted to Basin Electric Power Cooperative, a North Dakota entity that submitted

**2.** The Commission determined that because West River's service area encompassed a portion of the base, it was also a party to the proceedings. West River chose not to participate, but instead simply filed a letter with the Commission stating its position. As an appellee in the present case, West River adopts the arguments of Heartland and the United States.

a bid lower than Heartland's. Because the parties are requesting future injunctive relief rather than money damages, the issues concerning Heartland's authority are now moot.

Heartland, the United States, and West River appealed the Commission's decision to the South Dakota circuit courts, and the United States subsequently removed this appeal to the United States district court. In addition, Black Hills commenced an action for declaratory and injunctive relief, seeking to have the district court require that the United States contract with Black Hills for the provision of overrun power, and the United States brought an action seeking to enjoin the Commission from preventing the United States from using competitive procedures. The district court consolidated these four cases. *Black Hills Power & Light Co. v. Weinberger*, Civ. 85–5031, 85–3015, 85–4068, 85–5064, slip op. at 2–4 (D.S.D. Oct. 16, 1985). The court denied Black Hills' motions for a preliminary injunction and summary judgment and granted the United States' motion to dismiss. Slip op. at 15. The court dismissed as redundant the United States request for injunctive relief. *Id.* at 15–16.

The district court held that there was a conflict between state and federal law, and that the supremacy clause, U.S. Const., art. VI, cl. 2, prevented the Commission from forcing the United States to contract with a specified electric utility. Slip op. at 6–13. Additionally, the court concluded that the Commission lacks jurisdiction over Ellsworth Air Force Base because it is an exclusive federal enclave. *Id.* at 14. In the alternative, the district court concluded that the South Dakota utility statutes do not apply to the United States. *Id.* at 14–15.

## I.

■ Congress has the power "[t]o exercise exclusive Legislation ... over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings." U.S. Const. art. I, § 8, cl. 17. The grant of "exclusive" legislative power to Congress over federal enclaves, by its own weight, bars state regulation without specific congressional approval. *Paul v. United States*, 371 U.S. 245, 263, 83 S.Ct. 426, 437, 9 L.Ed.2d 292 (1962). The importance of distinguishing between jurisdiction on state-owned land and on a federal enclave was articulated by the Supreme Court in *Pacific Coast Dairy, Inc. v. Department of Agriculture of California*, 318 U.S. 285, 63 S.Ct. 628, 87 L.Ed. 1 (1943). There, a California milk dealer attempted to prevent the California Department of Agriculture from revoking his license for selling milk to the War Department (now Department of Defense) at less than the minimum price fixed by state law. The sale and delivery took place on Moffett Field, federally-owned land, and the Court held that that alone precluded state regulation of the sale, even in the absence of conflicting federal regulation. 318 U.S. at 294, 63 S.Ct. at 630. The Court distinguished *Pacific Coast Dairy* from *Penn Dairies, Inc. v. Milk Control Commission of Pennsylvania*, 318 U.S. 261, 63 S.Ct. 617, 87 L.Ed. 748 (1943), decided the same day, in which the same state milk control law was held applicable to War Department contracts that were made on land owned by Pennsylvania, and therefore within Pennsylvania's jurisdiction and control. *Id.* 318 U.S. at 295, 63 S.Ct. at 630. The Court held that the distinction between regulation on federal land and on state land was not a technical one, but was necessary to preserve the balance between national and state power and honor Congress' exclusive jurisdiction under the Constitution. *Id.* at 295–96, 63 S.Ct. at 630–31.

■ It is undisputed that 88% of the Air Force base, including all of the main operational facilities, was ceded to the United States, part in 1945, part in 1950, and the remainder in 1953. PUC Decision at 4 (referring to Black Hills Exhibit 15F). South Dakota reserved only the right to serve criminal and civil process; it surrendered all other jurisdiction. When there is a

transfer of sovereignty, state law adopted after the transfer is without force in the enclave. *Pacific Coast Dairy,* 318 U.S. at 294, 63 S.Ct. at 630.

■ In seeking bids for power in excess of its WAPA allocation, the United States specified that the point of delivery and metering is to be the federally-owned substation located on the base in territory owned by the United States. The electric power delivered to this substation is commingled with the power provided by WAPA and served throughout the entire base. South Dakota's division of the State into franchised utility areas and its authorization to the Commission to regulate electric service based on those assigned service areas was made long after it lost jurisdiction over the territory.[3] Thus, South Dakota had no authority to include the federal enclave in its assigned service territories for the purpose of exerting control over sales of electric service that are consummated within federal territory.

The Commission justifies regulating the United States' ability to use competitive bidding to obtain electrical service by stating the following:

> While the Commission herein does not attempt to exercise any jurisdiction over the United States through its operations through Ellsworth at the Base, the Commission does exert its jurisdiction over Black Hills, Heartland and West River in determining who has the right to furnish electric service to the Base. Even if that part of the Base which was ceded to the United States is not within the jurisdiction of the Commission, that part of the Base which was not ceded to the United States is under the Commission's jurisdiction, and in order to control the delivery of electric power and energy which is

commingled and served throughout the entire Base, it is necessary for the Commission to control the whole.

PUC Decision at 8.

We reject this analysis. First, as the district court noted, the Commission cannot avoid a clear constitutional barrier to state regulation of the enclave by claiming that it is only exercising jurisdiction over the supplier. The same argument failed in *Pacific Coast Dairy, supra,* where the Court rejected the lower court's determination that the state statute regulates only the purchasing, handling, and processing of milk within California and not the actual sale on Moffett Field. 318 U.S. at 295, 63 S.Ct. at 630. It was clear to the Supreme Court, as it is to us in this case, that the state was simply attempting to regulate sales on federal territory indirectly where it had no authority to do so directly. *Cf. United States v. Georgia Public Service Commission,* 371 U.S. 285, 83 S.Ct. 397, 9 L.Ed.2d 317 (1963) (Georgia Public Service Commission could not revoke certificates of carriers for contracting at rates other than those prescribed by Commission where state law conflicted with federal procurement policy); *Paul v. United States, supra* (California could not sue milk suppliers whose bids on a contract with United States or at a price below the state minimum when state regulation conflicted with federal procurement policy); *Leslie Miller, Inc. v. Arkansas,* 352 U.S. 187, 77 S.Ct. 257, 1 L.Ed.2d 231 (1956) (State could not apply its license requirement to building contractor who contracted with the United States where requirement would frustrate federal policy).[4]

■ This court also finds unpersuasive the assertion that the Commission may exercise jurisdiction over all of the federal

---

**3.** The Commission was first granted the authority to establish assigned service areas in 1965. 1965 S.D. Laws 254, § 14 (current version at S.D. Codified Laws Ann. § 49–34A–44). The Commission did not establish the territorial boundaries that encompass Ellsworth Air Force Base until 1976. PUC Decision and Order, F–3103 (July 1, 1976).

**4.** While these cases discuss conflicting state and federal regulation in the context of the supremacy clause, their analysis is equally applicable to state regulation that interferes with exclusive federal jurisdiction under the enclave clause. They illustrate that a state cannot diminish the constitutional authority of the United States government by regulating the parties with whom it may contract.

territory because approximately 12% of the Air Force base is on land that has not been ceded to the United States. As previously stated, the point of delivery and metering for the overrun electricity is a substation owned by the United States, through WAPA, and is located on land that has been ceded to the United States. The overrun power is commingled with that supplied by WAPA and may or may not be distributed to the buildings in non-federally owned territory. Some of this overrun electrical power, either that provided by WAPA or that provided by the electric utility with whom the United States contracts, may be used in areas that are within the ceded territory. Likewise, some of the power supplied by WAPA, a federal agency over which the Commission admittedly has no jurisdiction, *see* PUC Decision at 8–9, may serve the area that is within the State's jurisdiction. Once the power is commingled at the point of delivery, it is impossible to determine what portion of the base is served by WAPA and what portion is served by the private utility. We believe that exclusive federal jurisdiction over eighty-eight percent of the base need not be surrendered because of the possibility that the purchase and distribution of electricity within the enclave may affect the need for electricity on the small section of the base that is still within South Dakota's jurisdiction. These effects are not enough to allow the Commission to regulate transactions that take place exclusively within the enclave. *Cf. United States v. State Tax Commission of Mississippi*, 412 U.S. 363, 93 S.Ct. 2183, 37 L.Ed.2d 1 (1973) (twenty-first amendment confers no power on a state to regulate importation of alcohol into a military base on exclusive federal territory even if liquor sold there is for use and consumption on state-owned land).

The facts indicate that the purpose behind the State's regulation of service territories, the "prevention of unnecessary duplication of electric facilities," PUC Decision at 8, would be best served if the United States had jurisdiction over the procurement and distribution of electric service for the entire base. As previously stated, with the exception of the Renel Heights housing area, the United States owns, operates and maintains the entire Ellsworth electrical system. In addition, the Commission admits that it has no jurisdiction to restrict the amount of electrical service generated by the United States through WAPA, and that WAPA *could* serve even the non-ceded portions of the base. *Id.* at 8–9. In fact, until 1984, when the demand for power at Ellsworth exceeded its WAPA allocation, the Commission did not control the power that was delivered to the non-ceded portion of the base. Thus, the rationale that the Commission's lack of authority to control the flow of power to the state-owned territory will result in unnecessary duplication of electric facilities is without logic. However, we need not extend the jurisdiction of the United States beyond the borders of the federally-owned territory in order to hold that South Dakota has no jurisdiction to prevent the United States from using competitive bidding to purchase electric service for delivery within the enclave.

Black Hills and the Commission assert that state jurisdiction is permissible because there is no interference with the jurisdiction asserted by the federal government. However, the cases cited by appellants do not support their position regarding state jurisdiction or regulation within a federal enclave. Appellants argue that *Howard v. Commissioners of the Sinking Fund*, 344 U.S. 624, 73 S.Ct. 465, 97 L.Ed. 617 (1953), provides authority for the Commission's division of Ellsworth into assigned service areas. In *Howard*, the Supreme Court allowed the City of Louisville to annex certain territory, embracing a Naval Ordnance plant that had been acquired by the United States. The Court held that it was permissible for the State to include the plant within the boundaries of the city, as "[a] state may conform its municipal structures to its own plan, *so long as the state does not interfere with the exercise of jurisdiction within the federal area by the United States.*" *Id.* at 626–27, 73 S.Ct. at 467 (emphasis added). Thus, *Howard* does nothing to alter the exercise of exclu-

sive federal jurisdiction over federally-owned territory. The Court determined in that case that including the enclave within the city's boundaries did nothing to affect the use or disposition of the property by the United States. *Id.* at 627, 73 S.Ct. at 467. However, by ordering the United States to contract with a particular utility based on an assigned service area, the South Dakota Public Utilities Commission has directly interfered with the United States' control over the provision of electrical service within the base. Similarly, the other cases cited by Appellants all involve instances in which the state regulation only generally affected federal property, and in no way placed any restrictions on the ability of the United States to enter into contracts regarding the use of the federally-owned property. *See, United States v. City of Bellevue,* 474 F.2d 473 (8th Cir.), *cert. denied,* 414 U.S. 827, 94 S.Ct. 46, 38 L.Ed.2d 60 (1973) (City may annex Air Force base to the extent permitted by Congress); *Bartsch v. Washington Metropolitan Area Transit Commission,* 357 F.2d 923 (4th Cir.1966) (per curiam) (Washington, D.C. Commission had jurisdiction to set taxicab rates to and from Washington National Airport, a federal enclave).

In two factually similar cases, it was recognized that state regulation of utility service to federal installations intrudes upon the exercise of exclusive federal jurisdiction. In *re Souris River Telephone Mutual Aid Corporation,* 24 Pub.Util.Rep.3d (PUR) 84 (1958), the North Dakota Public Service Commission held that it had no power to grant or deny a certificate to construct telephone facilities on a federally owned Air Force base where jurisdiction and control of the land had been transferred to the federal government. *Id.* at 86. Likewise, in *Arkansas Power and Light Company v. Arkansas Public Service Commission,* 231 Ark. 142, 330 S.W.2d 51, *cert. denied,* 362 U.S. 975, 80 S.Ct. 1060, 4 L.Ed.2d 1011 (1960), the Arkansas Supreme Court recognized that allowing the State Public Service Commission to designate, based on specified service areas, the utility from which the United States government

must purchase electricity would interfere with carrying out the operations of the Air Force base. *Id.* at 144–148, 330 S.W.2d at 52–54. In that case, because the United States had not acquired jurisdiction over the land on which the Air Force base was located, the Arkansas court based its decision on actual conflict between state and federal regulation. Here we are dealing with a federal enclave, and the United States has exclusive jurisdiction even absent such conflict. *Paul,* 371 U.S. at 263–64, 83 S.Ct. at 437.

**II.**

■ Black Hills and the Commission argue strenuously that even if this is federally-owned territory, Congress has taken specific action mandating that federal procurement officers follow state utility franchise law in purchasing electricity. *See Paul,* 371 U.S. at 245, 83 S.Ct. at 426. In substance, appellants argue that even if the federal government has exclusive jurisdiction over the enclave, federal law specifically defers to state utilities franchise law and prevents Ellsworth from procuring services through competitive bidding. After carefully examining the relevant federal law, we must reject this argument.

Federal procurement law is specifically designed to ensure "active competition so that the United States may receive the most advantageous contract." *Paul,* 371 U.S. at 253, 83 S.Ct. at 432. The authority to procure public utility services for the military has been delegated by the General Services Administration (GSA) to the Secretary of Defense. *See* 15 Fed.Reg. 8227 (Dec. 1, 1950) (adopted as amended at 41 C.F.R. § 101–33.002). The "Statement of Understanding" between the GSA and the Department of Defense provides that:

> The basic purpose of the agreements and procedures outlined herein relating to utility services is that all these services shall be procured or provided *at the minimum practical total cost to the government.*

*Id.* (emphasis added).

The statutes and regulations applicable when the United States solicited bids in

1984—as well as the recent amendments under the Competition in Contracting Act of 1984, Pub.L. No. 98–369, 98 Stat. 1175 (relevant portions codified in scattered sections of 10 U.S.C. and 41 U.S.C.), applicable at the time of the two subsequent procurement decisions [5]—do not mandate that federal officers follow state utility franchise law in procuring electrical service. Quite the opposite is true. The Federal Acquisition Regulation makes clear that the general rule is the promotion of "full and open competition in soliciting offers and awarding Government contracts." 48 C.F.R. § 6.101 (1985) (citing 10 U.S.C. § 2304 (Supp. III 1985)). The procuring agency must use competitive procedures unless the agency, in exercising its discretion, determines that competition does not exist. If the procurement official determines that competition does not exist, the regulations *permit* him to depart from standard competitive procedures. However, there is nothing in the regulations that *require* him to do so.

One example of when an agency may depart from using competitive procedures is when there is only one available source:

The head of an agency may use procedures other than competition only when—

(1) the property or services needed by the agency are available from only one responsible source and no other type of property or services will satisfy the needs of the agency.

10 U.S.C. § 2304(c)(1); *see also* 48 C.F.R. 6.302–1(a)(2).

The term "responsible source" is defined at 41 U.S.C. § 403 (Supp. III 1985).[6] It includes a number of relevant factors to be considered by the procuring agency, one of which is whether the prospective contractor "is otherwise qualified and eligible to receive an award under applicable laws and regulation." *See id.* § 403(8)(G). Black Hills argues that "[s]tate electric law is applicable law" and that these regulations "strengthen the argument that the Department of Defense should follow state law in the procurement of utility services." Black Hills Brief at 39, 41. The statute's reference to "applicable law," however, does not change the discretionary nature of determining whether more than one responsible source exists and whether competitive procedures should be departed from.

It is relevant that in the *Paul* case, *supra,* the Supreme Court examined almost identical language in a federal procurement provision and held that it did not require the procurement official to follow state law:

[T]he references to rates or prices "fixed by law or regulation" are merely minor collateral accommodations to those situations where, within the limits of the Regulation and the 1962 Act, the federal procurement official decides that the practical way to obtain the supplies or

---

**5.** An appellate court must apply the law in effect at the time it renders its decision. *Bradley v. Richmond School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974) (quoting *Thorpe v. Housing Authority of the City of Durham,* 393 U.S. 268, 281, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969)). Thus, we must consider the Competition in Contracting Act as applicable law. This is particularly appropriate since this case is one for injunctive relief—an order requiring the government to purchase electrical service for Ellsworth from Black Hills.

**6.** This section provides:

(8) the term "responsible source" means a prospective contractor who—

(A) has adequate financial resources to perform the contract or the ability to obtain such resources;

(B) is able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and Government business commitments;

(C) has a satisfactory performance record;

(D) has a satisfactory record of integrity and business ethics;

(E) has the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain such organization, experience, controls, and skills;

(F) has the necessary production, construction, and technical equipment and facilities, or the ability to obtain such equipment and facilities; and

(G) is otherwise qualified and eligible to receive an award under applicable laws and regulations.

services is by following the state price-fixing or rate-fixing system.

371 U.S. at 260–61, 83 S.Ct. at 436.

Thus, the determination of whether competition exists is not one to be made based on South Dakota utility franchise law, but instead is within the sound discretion of the Air Force.

Uniform policy for the procurement of utility services by the Department of Defense is provided by Armed Services Procurement Regulation Supplement No. 5. *See* 48 C.F.R. § 208.3 (1985). Contrary to the assertions of the Commission and Black Hills, Supplement No. 5 does not amount to specific congressional action directing the Air Force to follow state utility service areas in purchasing electricity. While Supplement No. 5 describes instances in which competition may not be possible because of the existence of state franchise areas, it includes no directive to Department of Defense agencies to surrender their discretion in determining the the existence of competition in order to secure a contract for the government "at the minimum practical total cost * * *." 15 Fed.Reg. 8227 (Dec. 1, 1950).

Appellants rely quite heavily on the language in paragraph S5–104.1, entitled "Determination as to the Existence of Competition," which states:

(a) Although in most instances utility service suppliers operate in franchised territory, competition may nevertheless exist—for example, where more than one supplier is franchised for a given location, or where more than one supplier is able to provide service at a given location but no supplier has yet been franchised for that location. Therefore, when the location of a new military installation has been determined and the procurement of utility services is authorized, the contracting activity shall determine whether more than one supplier can provide the service. Where competition exists, proposals shall be solicited from all potential suppliers. Even where one of the competing potential suppliers has entered into a GSA area contract, proposals shall be solicited to determine definitely which of the suppliers offers more advantageous competing services under the particular circumstances.

(b) Similarly, where an existing installation is being served by one supplier, and either another prospective supplier requests an opportunity to furnish the service or the Department concerned becomes aware of another potential supplier, the Department shall determine whether more than one supplier can provide the service. Where competition is found to exist, competitive solicitation of proposals shall be initiated at whatever time is considered to be most advantageous to the Government.

The district court correctly determined that this section applies only to new military installations or existing installations being served by only one supplier. Slip op. at 11. Ellsworth is neither a new installation nor is it supplied electricity only by Black Hills. To the contrary, the majority of its power is provided by WAPA through the WAPA-owned system. Even in those instances where paragraph S5–104.1 does apply, the main concern is whether competition exists as a practical matter. While state franchise territories may indicate that competition is not possible, their existence does not preclude the United States from making this determination. In the present case, the United States owns the electrical system that serves over 94% of the Air Force base. The Ellsworth contracting officer determined that a number of potential suppliers could distribute energy through the federally-owned lines without duplication of transmission facilities. Having determined that competition exists, Supplement No. 5 mandates that "proposals shall be solicited from all potential suppliers." ¶ S5–104.-1(a). Thus, the actions of the Air Force in seeking competitive bidding for the overrun electricity were clearly authorized by the relevant procurement statutes and regulations.[7]

7. Appellants' reliance on the Public Utility Regulatory Policies Act of 1978, 16 U.S.C. §§ 2601–

### III.

Finally, we must address the controversy surrounding Section 8.304–91 of the Air Force Federal Acquisition Regulation Supplement issued on June 24, 1985, the proposed rule of May 7, 1986, and subsequent congressional legislation preventing enforcement or implementation of either of these new regulations.[8] The Air Force regulation was issued by the Department of the Air Force as an internal procurement management instruction and was not published in the Federal Register.[9] The May 7, 1986 proposed rule was proposed jointly by the Department of Defense, GSA, and NASA. Both the proposed rule and the Air Force regulation make clear that contracting officers must acquire utility services competitively, and the existence of state or local franchise service territories may not be used as a basis for deeming the acquisition of utilities to be a "sole source" exception to the normal competition requirements. This is a departure from previous regulations in that it takes away the discretion of the federal agencies: they must, in every case, use competitive procedures.

The district court referred to the proposed rule in its opinion and intimated that although it did not apply retroactively to the 1984 procurement, it appeared to moot Black Hills' claim for any future injunctive relief. Slip op. at 12. Since the district court opinion was issued, however, Congress has adopted legislation that prevents any of the funds appropriated for the Department of Defense in 1987 to be used to implement or enforce either the proposed rule or Section 8.304–91 of the Air Force FAR Supplement. Act of Oct. 18, 1986, Pub.L. No. 99–500 (enacting into law H.R.J. Res. 738, 99th Cong., 2d Sess. (1986) (making continuing appropriations for the fiscal year 1987)). Furthermore, the Conference Committee has directed the Department of Defense "not to implement additional changes affecting the purchase of utilities until after they have been formally presented to and approved by the Committee on Appropriations of the House and Senate." 132 Cong.Rec. H10728 (daily ed. Oct. 15, 1986). Responding to the "significant policy issues" raised by the proposed

2645 (1982), is misplaced. That Act simply indicates that the federal government has not preempted state regulation of electric utilities that provide retail service. Although the Act recognizes that states may continue to regulate the operations of utility suppliers within the state, it does not permit state regulations to displace federal jurisdiction on a federally-owned enclave. Nor does it alter federal procurement law. *See, e.g., United States v. Georgia Public Service Commission,* 371 U.S. 285, 83 S.Ct. 397, 9 L.Ed.2d 317 (1963), (although state generally regulates shipping rates by intrastate carriers, regulations must give way in light of conflicting federal procurement policy).

**8.** The addition to the Air Force Federal Acquisition Regulation Supplement, section 8.304–91, provides:

The contracting officer shall determine by market survey if more than one supplier can furnish needed public utility services for proposed procurements prior to using other than competitive procedures. The existence of franchised service territories established by state or local governmental entities does not in and of itself restrict acquisition of public utility services to a sole source. The contracting officer need not enter into a contract with the state or locally franchised public utility supplier simply because the supplier has ob-

tained the local franchise. The contracting officer should instead seek to competitively acquire public utility services whenever possible.

Likewise, the relevant part of the May 7, 1986 proposed rule states:

41.104 Acquisition Policy

\*     \*     \*     \*     \*     \*

(b) The existence of franchised service territories is not a justification for the acquisition of utility services on a "Sole Source" basis (see 6.302–1).

\*     \*     \*     \*     \*     \*

(d) The contracting officer shall acquire utility services by contract \* \* \* whether or not rates or conditions of service are fixed by a Federal, State, or other regulatory body. 51 Fed.Reg. 16989 (1986) (to be codified at 48 C.F.R. pt. 41) (proposed May 7, 1986).

**9.** In their briefs, appellants argue that this regulation was not timely issued under section 2752 of the Competition in Contracting Act of 1984, Pub.L. No. 98–369, 98 Stat. 1203 (referenced in 41 U.S.C. § 403 note), and that it was a substantive change that should have been published in the Federal Register. In light of the subsequent congressional legislation prohibiting the regulation's enforcement or implementation, we need not address this question.

rule, the Department of Defense, GSA, and NASA stated that a final rule on the acquisition of utility services would not be promulgated until those issues are resolved. 51 Fed.Reg. 36970 (Oct. 16, 1986). They issued a final rule amending FAR Section 8.300 to read:

> This subpart prescribes policies and procedures for the acquisition of utility services. Agency policies and procedures predating the effective date of the Federal Acquisition Regulation (FAR) may continue to be used. However, any new or changed policies or procedures must be approved in advance by the appropriate FAR council.

*Id.* at 36971.

Appellants contend that this new congressional legislation and the amendment to FAR reaffirm Supplement No. 5 as the applicable law in procuring utility services. While this is a correct assertion, it does not advance their position. We have already determined that Supplement No. 5 does not require the federal government to defer to a state's regulation of franchise territories; nothing in the new legislation changes this. The reports accompanying the legislation indicate concern over a general procurement policy that would require federal contracting officers to "ignore state-created utility service territories." S.Rep. No. 406, 99th Cong., 2d Sess., § 618, at 68 (1986); H.R.Rep. No. 723, 99th Cong., 2d Sess., 620, at 79 (1986). The Senate report states the following:

> The Committee has adopted this section to protect utility customers from the burden of increased rates that inevitably would result if federal facilities abandon local utility systems. Utility systems have built necessary capacity under State-created obligations to serve all customers, including federal facilities, within their service territories. As a general rule, under state law only one utility is authorized to provide retail utility service within its service territory. The proposal has serious legal, technical, and economic repercussions. The committee intends that this provision avoid these detrimental consequences.

S.Rep. No. 406, 99th Cong., 2d Sess. § 618, at 68 (1986).

This statement indicates that Congress was concerned with a particular situation: one in which a federal facility that obtains all of its electricity from a single utility switches suppliers and abandons a local utility system that has already built the necessary capacity. In the present case, however, the general rule that "only one utility is authorized to provide retail utility service" does not apply. Both WAPA and Black Hills provide service to the main base.[10]

Ellsworth is not abandoning the Black Hills facilities, but is making the most efficient use of the existing WAPA distribution system.[11] We do not believe that Congress intended to prevent the use of competitive procedures in this situation. Had Congress wanted to mandate that state franchise law governs the determination of when a utility is in a "sole source" position, it could easily have done so. Congress has specifically provided that agencies may use other than competitive procedures if a statute requires that procurement be from a specified source. 10 U.S.C. § 2304(c)(5). However, Congress has never enacted a statute requiring that the United States purchase utility service from local franchise utilities. Finding nothing in federal law that specifically directs such procurement, we cannot order Ellsworth to con-

---

**10.** The parties have strongly disputed whether the sale of overrun power to Ellsworth is a sale at retail or wholesale. The Commission determined that, under South Dakota law, the sale is at retail. The district court, however, did not reach that issue. For our present purpose, it is relevant to note only that, whatever label is given to the type of electric service being provided, the electricity delivered by WAPA and by the supplier of the overrun amounts is used for the same purposes. Thus, there is more than one authorized utility providing the same service.

**11.** The competitive bidding procedure for procuring overrun power had no effect on Black Hills' service to the Renel Heights area. Black Hills continues to use its electrical system to provide service to this housing area.

tract with Black Hills for the overrun electrical service to an exclusive federal enclave.

The judgment of the district court is affirmed.