WEST RIVER ELECTRIC
ASSOCIATION, INC.,
Plaintiff,

v.

BLACK HILLS POWER AND LIGHT
COMPANY and Ellsworth Air Force
Base, Defendants. (Three Cases)

BLACK HILLS POWER AND LIGHT
COMPANY, Plaintiff,

v.

HEARTLAND CONSUMERS POWER
DISTRICT, Defendant.
(Three Cases)

Nos. CIV. 88–5151 to CIV. 88–5153
and CIV. 89–5019.

United States District Court,
D. South Dakota, W.D.

Aug. 14, 1989.

Wayne F. Gilbert, Banks, Johnson, Johnson, Colbath and Huffman, Rapid City, S.D., for West River Elec. Ass'n, Inc.

David E. Morrill, Timothy L. Thomas, Morrill Brown & Thomas, Rapid City, S.D., for Black Hills Power and Light Co.

Drake Cutini, Surell Brady, Dept. of Justice, Civ. Div., Washington, D.C., Major Gary A. Enders, HG USAF/ULT, Tyndall Air Force Base, Fla., Ted L. McBride, United States Atty., Rapid City, S.D., for Ellsworth Air Force Base.

Vincent J. Protsch, Mumford, Protsch and Pardy, Madison, S.D., for Heartland Consumers Power Dist.

## MEMORANDUM OPINION AND ORDER

BATTEY, District Judge.

## NATURE AND PROCEDURAL HISTORY

### (a) Current Parties and Nature of Case

This matter comes before the Court on cross motions for summary judgment of Black Hills Power and Light Company (Black Hills), West River Electric Association, Inc. (West River), Heartland Consumers Power District (Heartland), and Ellsworth Air Force Base (Ellsworth). This case involves an appeal from an October 31, 1988, order of the South Dakota Public Utilities Commission (PUC) reinstating the PUC's February 4, 1985, order requiring Ellsworth to purchase its excess power from Black Hills and terminating the service contract between Ellsworth and Heartland.

The parties to this action are as follows:

1. *Black Hills.* Black Hills Power and Light Company is an investor-owned electric company engaged in the generation, transmission, distribution, and sale of electric power and energy to the Black Hills area of South Dakota, and parts of Wyoming and Montana.

2. *West River.* West River Electric Association, Inc., is a rural electric cooperative providing electric service to its member-consumers in an area located adjacent to and east of the service territory of Black Hills.

3. *Heartland.* Heartland Consumers Power District is a public corporation and political subdivision of the state of South Dakota, formed as a consumers power district under the provisions of South Dakota Codified Laws (SDCL) 49–35.

4. *Ellsworth.* Ellsworth Air Force Base is a military installation operated by the Department of Defense of the United States located east of Rapid City in parts of Meade and Pennington Counties, South Dakota.

### (b) Pre–1987 History

This case essentially represents a second attempt on the part of Black Hills to secure the exclusive right to deliver electric power to Ellsworth. The first attempt failed when the Eighth Circuit Court of Appeals concluded: (1) Ellsworth was a federal enclave under exclusive federal jurisdiction; (2) nothing in federal procurement law directed the Ellsworth contracting officials to follow state utility franchise law; and (3) none of the legislation enacted by Congress while the case was pending altered the Court's decision. *Black Hills Power & Light Co. v. Weinberger,* 808 F.2d 665, 666

(8th Cir.1987), *cert. denied,* 484 U.S. 818, 108 S.Ct. 73, 98 L.Ed.2d 36 (1987).

The facts set forth in *Weinberger* at 666–67 outline the procedural and factual basis for the Court's decision and provide ready reference to the understanding of the post–1987 history.

### (c) Post–1987 History

Subsequent to the Supreme Court's denial of the petition for writ of certiorari (October 5, 1987) in *Weinberger,* Congress passed an act which provided as follows:

> None of the funds appropriated or made available by this or any other act with respect to any fiscal year may be used by any department, agency, or instrumentality of the United States to purchase electricity in a manner inconsistent with state law governing the provision of electric utility service, including state utility commission rulings and electric utility franchises or service territories established pursuant to state statute, state regulation, or state-approved territorial agreements: provided, that nothing in this section shall preclude the head of a federal agency from entering into a contract pursuant to 42 U.S.C. § 8287; or shall it preclude the secretary of a military department from entering into a contract pursuant to 10 U.S.C. § 2394 or from purchasing electricity from any provider when the utility or utilities having applicable state-approved franchise or other service authorizations are found by the secretary to be unwilling or unable to meet unusual standards for service reliability that are necessary for purposes of national defense.

Pub.L. No. 100–202, § 101(b), Title VIII, § 8093, 101 Stat. 1329–79 (Dec. 22, 1987).

This action involves the interpretation of this statute as it may apply to the delivery of electric power to Ellsworth and its impact upon those issues decided by *Weinberger.* Simply put, did section 8093 constitute congressional intent to alter the effect of the decision in *Weinberger?*

Nine months after the passage of section 8093, Black Hills filed a motion on September 12, 1988, with the PUC to reinstate the 1985 PUC order in light of section 8093. Four days later, West River filed a complaint with the PUC alleging, among other things, that West River was entitled to be the sole supplier of overrun electrical power to Ellsworth. These cases were consolidated and a hearing was held on September 29, 1988. On October 31, 1988, the PUC reinstated its order of February 4, 1985, requiring Ellsworth to acquire its excess power from Black Hills and terminating the service contract between Ellsworth and Heartland.

The PUC order of October 31, 1988, substantially parallels in both form and content its previous order of February 4, 1985, reflecting the PUC's position that section 8093 represented authority to now do what it was prohibited from doing by *Weinberger.*

The PUC's findings of fact of October 31, 1988, generally reflect changes to the February 4, 1985, order in the following particulars:

1. Minor changes in the procedure and history were noted, including an update of the facts transpiring between the date of the two orders.

2. Paragraph 8 recognized that West River claimed to have served a small load (less than 500 kwh per month average), but PUC found that such service was *de minimus.*

3. Paragraph 13 recognized that since 1984 supplemental electric service has been provided by Heartland on several one-year contracts.

4. Paragraph 14 cites section 8093 finding that "Since the passage of section 8093, Ellsworth was required to follow state utility commission rulings regarding which entity may be entitled to be the sole supplier of electricity to Ellsworth."

5. Paragraph 18 addressed the facts of the location of electric power on the base as follows:

> 18. *Location of Electric Power Use on Base.*
>
> From the evidence presented and from the personal inspection of the Commission, the Commission in its 1984 Decision

found that a majority of the electric power and energy used on the Base is used in that part of the Base which is a part of BHP & L's assigned service area. The evidence presented by West River at the 1988 hearing addresses only the power used in facilities constructed in West River's and BHP & L's territories since 1985. West River's evidence does not address the crucial issue of where the majority of the electric load is utilized considering all of the facilities on the Base. The evidence offered by West River at the September 29, 1988 hearing is insufficient to overturn the Commission's prior conclusion that the majority of electric power and energy used on the Base is used on that part of the Base which is part of BHP & L's assigned service area.

6. Paragraph 19 concludes that failure to comply with section 8093 could cost Black Hills $250,000 annual revenue.

Based upon the findings, the PUC in its conclusions of law reasserted its position as to jurisdiction as follows:

## II.

### *Jurisdiction.*

(1) Commission Jurisdiction over BHP & L, Heartland and West River

The Commission has jurisdiction over BHP & L, Heartland and West River for the purpose of determining customers at specific locations and service areas within which each of said electric utilities are entitled to serve under the provisions of SDCL 49–34A–42 and 49–34A–44. Heartland's authority to sell energy is strictly limited by SDCL 49–37–3.

. . . . . .

## XIII.

### *§ 8093 Applies to the Instant Case*

The Commission concludes that § 8093 is an absolute dictate for a federal agency to follow state franchise service territory law which permits no discretion. Accordingly, § 8093 applies to the instant case by strictly requiring Ellsworth to comply with South Dakota franchise

service territory law. Ellsworth contends, however, that Congress intended § 8093 to apply to the circumstance where a federal agency's failure to comply with state franchise service territory laws may result in loss of load to the affected utility. Even if Ellsworth's contention were valid, since Ellsworth's failure to comply with § 8093 could substantially harm BHP & L due to the potential loss of Renel Heights housing area, § 8093 does apply to the circumstances of this case.

## XIV.

### *Prior Decision and Order Validated*

The Decision and Order of the Commission entered on February 4, 1985, in which it was ordered that BHP & L was the electric utility which is entitled to furnish all the electric power and energy needs of the United States at that part of Ellsworth referred to as "Base" has been validated by the passage of § 8093. Furthermore, § 8093 has cured whatever deficiencies previously existed in the commission's Decision and Order of February 4, 1985, as identified by the Opinions in United States District Court and the Eighth Circuit Court of Appeals in *Black Hills v. Weinberger, et al.* The Commission's previous Decision and Order is *res judicata* as to all the issues presented herein, those issues having been previously fully litigated by and between all the parties hereto. The Decision and Order of the Commission on February 4, 1985 is, however, hereby modified to recognize the following: (1) the passage of § 8093; (1) [sic] the fact that BHP & L has the present ability to serve; and (3) that BHP & L may begin serving the additional electric power and energy to Ellsworth for use at the Base on the date of this Order.

The PUC then ordered the Commission's decision of February 4, 1985, reinstated and incorporated in the order of October 31, 1988.

On November 8, 1988, Heartland appealed the PUC's ruling to the Circuit Court,

Lake County, Fourth Judicial Circuit, South Dakota. The case was removed to United States District Court for the District of South Dakota, Southern Division, on December 5, 1988. Ellsworth filed a notice of appeal in the Circuit Court, Hughes County, Sixth Judicial Circuit, South Dakota, and removed that appeal to the Central Division of United States District Court, District of South Dakota, on November 23, 1988. Venue in both actions was transferred to the Western Division of the District of South Dakota on December 7, 1988, and these cases were consolidated on January 11, 1989. Black Hills moved this Court for an order enforcing the PUC order of October 31, 1988, which motion was denied.[1] The Court thereupon set a briefing schedule to permit the parties to present the matter for appropriate resolution by summary judgment under Fed.R.Civ.P. 56.

## SOUTH DAKOTA TERRITORIAL INTEGRITY STATUTES

In 1975 the state of South Dakota adopted a comprehensive gas and electric utilities law pertaining to the regulation of investor-owned electric utility companies and rural electric cooperative associations. With the advent of the rural electric movement during the mid-1940s, and the resultant conflicts over service areas and con- sumers with the various investor-owned electric utilities, there occasioned various struggles for not only service areas, but for specific customers. While no useful purpose would be served by detailing the various items of legislation which appeared in the legislature from time to time, suffice it to say that imposing Chapter 283 of the Session Laws of 1975, codified as SDCL 49–34A, the legislature adopted a detailed law providing for gas and electric utilities regulation. Chapter 49–34A was intended to be complete in itself. Any law in conflict with the chapter was expressly repealed insofar as it pertained to the regulation of electric utilities as defined in 49–34A–71. The stated purpose of the legislation was to require every public utility (the definition of which included both investor-owned and rural electric cooperatives) to furnish adequate, efficient, and reasonable service (49–34A–2).

The PUC was vested with the powers and jurisdiction necessary to regulate such public utilities as provided by law (49–34A–4). It was given the authority to regulate all rates for service (49–34A–6), and regulate the sale, lease or merger of public utilities (49–34A–35).

By sections 49–34A–42 through 49–34A–44,[2] the legislation defined the electric utili-

---

**1.** The Court stated as follows:

The Court has examined the PUC order of October 31, 1988, and finds it is clearly inconsistent with the Court's prior decisions on these same issues. *Cf. Black Hills Power & Light v. Weinberger,* Civ. 85–5031, Western District of South Dakota (1985) *aff'd,* 808 F.2d 665 (8th Cir.), *cert. denied,* [484 U.S. 818], 108 S.Ct. 73, 98 L.Ed.2d 36 (1987). The Court is not convinced that the passage of Pub.L. No. 100–202, § 8093 is a clear congressional mandate that gives a state public utility commission the authority to control whom a federal enclave may contract with to purchase electricity. Until further briefing on this case is received, the Court will enforce the ruling set forth in *Black Hills Power & Light Co. v. Weinberger,* 808 F.2d 665 (8th Cir.1987). Black Hills' motion to enforce the order of the PUC is therefore denied.

**2.** 49–34A–42. Electric utility's exclusive rights in assigned service area—Connection facilities in another area. Each electric utility shall have the exclusive right to provide electric service at retail at each and every location where it is serving a customer as of March 21, 1975, and to each and every present and future customer in its assigned service area and no electric utility shall render or extend electric service at retail within the assigned service area of another electric utility unless such other electric utility consents thereto in writing; provided, that any electric utility may extend its facilities through the assigned service area of another electric utility if the extension is necessary to facilitate the electric utility connecting its facilities or customers within its own assigned service area.

43–34A–43. Boundaries of assigned service areas—Contracts between utilities—Service areas within municipalities. The boundaries of each assigned service area, outside of incorporated municipalities, shall be a line equidistant between the electric lines of adjacent electric utilities as they existed on March 21, 1975, provided that these boundaries may be modified by the public utilities commission to take account of natural and other physical barriers which would make service of electric power and energy beyond those barriers economically impractical and shall be modified to take account of the

ties' exclusive rights in assigned service areas. 49–34A–42. The legislation essentially froze the boundaries of each assigned service area outside of an incorporated municipality as the area existed on March 21, 1975, providing, of course, that the commission was given authority to modify such assigned service areas as may be necessary (49–34A–43).

Finally, the legislation provided that on or before January 1, 1976, each electric utility should file with the commission a map or maps showing all of its electric lines outside of incorporated municipalities as they existed on the date of March 21, 1975. Thereafter on or before July 1, 1976, the commission was required to establish the assigned service area or areas of each electric utility and to prepare a map or maps to accurately and clearly show the boundaries of the assigned service area of each electric utility. In the case of areas where the existing electric lines of two or more electric utilities were so intertwined that boundaries could not be set under the directions of SDCL 49–34A–43, the commission was to determine the boundary of the assigned service area for the utilities involved. SDCL 49–34A–42 is referred to as the exclusive rights provision and 49–34A–

contracts provided for in this section, and provided further that said boundaries shall also be modified by the commission to take into account orders entered July 1, 1975 by the electric mediation board.

Contracts between electric utilities, which are executed on or before July 1, 1976, designating service areas and customers to be served by the electric utilities approved by the commission shall be valid and enforceable and shall be incorporated into the appropriate assigned service areas. The commission shall approve a contract if it finds that the contract will eliminate or avoid unnecessary duplication of facilities, will provide adequate electric service to all areas and customers affected and will promote the efficient and economical use and development of the electric systems of the contracting electric utilities.

Where a single electric utility provided electric service within a municipality on March 21, 1975, that entire municipality shall constitute a part of the assigned service area of that electric utility. Nothing contained in this chapter shall modify existing rights of municipalities to establish an electric utility. Where two or more electric utilities provided electric service in a municipality on March 21, 1975, the boundaries of the assigned service areas within an incorporated municipality shall be assigned pursuant to the equal distance concept as applied to lines located only within the municipal boundaries.

49–34A–44. Maps of service areas to be filed by electric utilities—Boundaries assigned by commission order—Adjustment of intertwined service areas—Protest of assigned service areas. On or before January 1, 1976, or, when requested in writing by an electric utility and for good cause shown, and at a further time as the public utilities commission may fix by order, each electric utility shall file with the commission a map or maps showing all its electric lines outside of incorporated municipalities as they existed on March 21, 1975. Each electric utility shall also submit in writing a list of all municipalities in which it provided electric service on March 21, 1975. Where two or more electric utilities serve a single municipality, the commission may require each utility to file with the commission a map showing its electric lines within the municipality.

On or before July 1, 1976, the commission shall, after notice and hearing, establish the assigned service area or areas of each electric utility and shall prepare or cause to be prepared a map or maps to accurately and clearly show the boundaries of the assigned service area of each electric utility.

In those areas where, on March 21, 1975, the existing electric lines of two or more electric utilities were so intertwined that § 49–34A–43 cannot reasonably be applied, the commission shall, after hearing, determine the boundaries of the assigned service areas for the electric utilities involved. In making its decision, the commission shall be guided by the following conditions as they existed on March 21, 1975:

(1) The proximity of existing distribution lines to such assigned territory, including the length of time such lines have been in existence;

(2) The adequacy and dependability of existing distribution lines to provide dependable, high quality retail electric service;

(3) The elimination and prevention of duplication of distribution lines and facilities supplying such territory;

(4) The willingness and good faith intent of the electric utility to provide adequate and dependable electric service in the area to be assigned;

(5) That a reasonable opportunity for future growth within the contested area is afforded each electric utility.

Any electric utility which feels itself aggrieved by reason of an assignment of a service area may protest such assignment within a ninety-day period after issuance of the map of the assigned service areas by the commission and the commission shall have the power, after hearing, to revise or vacate such assigned service area or portions thereof consistent with the provisions of this section and § 49–34A–43.

43 is referred to as the equidistant concept. *Northern Electric Cooperative, Inc. v. Northwestern Public Service Co.*, 281 N.W.2d 72 (S.D.1979).

■ The Supreme Court of South Dakota in the interpretation of the legislation held that consumer preference was irrelevant under the assignment of the service area. *In the Matter of Establishing Certain Territorial Electric Boundaries (Mitchell Area), Willrodt v. Northwestern Public Service Co.*, 281 N.W.2d 65 (S.D. 1979). Even when a consumer would enjoy significant economic benefits by purchasing electricity outside of the assigned service area, the established boundaries would not be disturbed. *Id.* at 72. The South Dakota Supreme Court held, "Consumer preference, while understandable, would, if controlling, defeat the orderly assignment of service areas." *Id.*

■ The South Dakota legislature's primary reason for passing the territorial electric boundaries legislation was the "elimination of duplication and wasteful spending in all segments of the electric industry." *Id.* at 70. Accordingly, the legislature's grant of essentially monopolistic privileges to electric utilities was for the promotion of the public interest and not for the benefit of the utilities. *Id.* at 70. This legislation was not a private law granting a special or exclusive franchise to electric utilities.

## HISTORY OF ELLSWORTH

Ellsworth Air Force Base was established on January 2, 1942, as Rapid City Army Air Force Base. The base was activated on July 31, 1942, for training B-17 bomber crews during World War II.

Ellsworth occupies 4,856.76 acres of which approximately 88 percent (4,261.57 acres), including all of the main operational facilities, has been ceded by South Dakota to the exclusive jurisdiction of the United States, part in 1945, part in 1950, and the remainder in 1953. South Dakota surrendered complete jurisdiction to the United States with the reservation only to the right to serve civil and criminal process. SDCL 1-1-5.

The principal operational unit assigned to Ellsworth is the 28th Bombardment Wing, a B-1 Bomber Wing. In January 1962, the 44th Strategic Missile Wing was formed, consisting of squadrons of Minuteman I missiles. The Fourth Air Division is now located on the base, having moved from F.E. Warren Air Force Base in Wyoming.

Support Groups provide the support for the operation of the base, including a base hospital, legal services, security police, chaplain, personnel, recreation, food services, base operations, communication facilities, and civil engineering support.

Ellsworth plays an important role in South Dakota, qualifying as the state's fourth largest community with a total population of approximately 17,800, including military personnel, civilian employees, and family members. The base has an economic impact on the local area of more than $291 million. In addition to those services already discussed, Ellsworth provides its community with a department store, grocery store, convenience store, and movie theatre. Like most communities, Ellsworth has a chapel, hospital, library, and youth center. Ellsworth also provides centers for fitness, recreation, arts and crafts, auto, hobby, bowling, and horseback riding. The base includes a restaurant and nightclub and a package beverage store. There are numerous counseling and support services, volunteer groups, and social clubs available to the members of Ellsworth's community. Electrical service is an integral part of Ellsworth's military operations and community.

## ELECTRICITY DISTRIBUTION

Black Hills provides electricity to the Renel Heights Housing Development on Ellsworth's main base. Black Hills owns and operates the transmission and distribution systems in Renel Heights. It supplies 5.3 percent of Ellsworth's total electric consumption. West River supplies electricity to two off-base housing sites which amounts to .6 percent of Ellsworth's total electric consumption. All electrical distribution, transmission, transformation, and street lighting systems on Ellsworth are owned, operated, and maintained by the

United States with the exception of Renel Heights.

Prior to 1984, Ellsworth received 94 percent of its electricity from Western Area Power Administration (WAPA), an agency of the United States Department of Energy. In 1984, WAPA could no longer provide all of Ellsworth's main base needs. After soliciting five bids, Ellsworth contracted with Heartland which was the lowest bidder. Under the current system, WAPA provides electricity to Ellsworth on a grid system with overrun electricity provided by Heartland. Ellsworth is allocated a total amount of 7,500 kilowatts of electricity. The grid system requires that the peak usage of Ellsworth be used to divide the 7,500 kilowatt allocation to determine the percentage of electricity provided by WAPA. For example, if the peak usage is 15,000 kilowatts, the percentage of electricity received from WAPA would be 50 percent, and the overrun from Heartland would be 50 percent (7,500 kilowatts divided by 15,000 kilowatts equals .5). The electricity from both WAPA and Heartland is received at the WAPA substation located at Ellsworth where the electricity is commingled for distribution on base. Ellsworth's transmission and distribution system is not compatible with the system used by Black Hills in providing electricity to the Renel Heights area.

The distribution of electricity at Ellsworth is regulated by meters to determine the amount of energy used by the various concerns on base. This is necessary because payment for electricity comes from differing base allocations within Ellsworth. For instance, electricity used by base housing is paid from housing allocations while that electricity received by the hospital is paid from the hospital's allocation. Other private enterprises, including the federal credit union, also receive electricity within Ellsworth's distribution system. In these instances Ellsworth enters into sales agreements with private businesses and bills them monthly for their electrical use. The amount Ellsworth charges these private enterprises is determined by considering the following factors: Ellsworth's purchase price for the electricity, maintenance and operation costs, administration costs, line loss, and capital costs. There is no factor for profit to Ellsworth. This apparent retail sale was deemed to be *de minimus* by the PUC in its October 31, 1988, decision and order.

## BLACK HILLS POWER & LIGHT CO. v. WEINBERGER

In *Black Hills Power & Light Co. v. Weinberger*, the Eighth Circuit Court of Appeals initially found that the United States has exclusive jurisdiction over Ellsworth, a federal enclave, and therefore, the PUC had no authority to order the United States to contract with a particular utility based on an assigned service area. *Id.* at 671. Secondly, the Eighth Circuit rejected the argument that despite the United States' exclusive jurisdiction, Congress had taken specific action mandating that federal procurement officers follow state utility franchise law in purchasing electricity. *Id.* In *Weinberger*, the PUC and Black Hills relied on the federal acquisition regulation, 48 C.F.R. § 203.3, Acquisition of Utility Services. That regulation states, "See Supplement No. 5, Procurement of Utility Services." The provisions of Supplement No. 5 considered by the Court are as follows:

SF–102 *General.* Utilities suppliers may be quasi-public service corporations, private concerns, municipalities, associations, or cooperatives. They generally operate in a franchise territory without competition, so they may frequently be in a "sole source" position. Under common law, however, public utilities must render service at reasonable rates and without unjust discrimination. Furthermore, their operations, management, rates, and profits are usually regulated by federal, state, or local regulatory bodies, but absence of a regulatory body does not necessarily mean a complete lack of control. Administrative remedies pursuant to enabling statutes may be pursued or complaints may be taken to a court of competent jurisdiction. In instances where such remedies are to be taken, authorization shall be obtained from the Chief of Engineers for the Army; the Command-

er, Naval Facilities, Engineering Command for the Navy; or Headquarters USAF (AF/LGPLA) for the Air Force; Executive Director of Procurement and Production, for DSA; or their designees.

S5–103.2 *Procurement from Utilities Suppliers.*

(a) The Department of Defense procures utility services from industries which are, to a greater or lesser extent, regulated by federal, state, and local regulatory bodies. Notwithstanding the other provisions of this regulation, as to those matters over which the appropriate regulatory body has taken jurisdiction, it is the policy of the Department of Defense, as a matter of comity rather than law, to comply with the current regulations, practices, and decisions of that body concerning accounting practices, allowability of cost pricing, and rates, subject to judicial appeal through the normal channels. As to those matters concerning which the regulatory body has not accepted jurisdiction or has not spoken, or for which there is no appropriate regulatory body, the rules of the Federal Power Commission and the general practices of the particular utilities industry as to accounting practices, allowability of costs, pricing, and rates, shall be followed. This policy does not extend to the regulations, practices, or decisions of regulatory bodies whose decisions are not subject to judicial appeal, nor does it extend to those agencies which are regulating utilities owned or operated by the same governmental entity which has established the regulatory body.

S5–103.3 *Cost or Pricing Data.* Rates or preliminary estimates quoted by utility suppliers for service for which the rates are established by an effective, independent regulatory body are considered "prices set by law or regulation" even if the rate will not be formally established until after the execution of the contract. Accordingly, such utility suppliers are not required under 3–807.3 to submit costs or pricing data for such services prior to the awarding of the contracts. On the other hand, rates or preliminary estimates quoted by a utili-

ties supplier for service for which the rates are not established by an effective, independent regulatory body are not considered "prices set by law or regulation" even though the supplier itself may be subject to regulation. The provisions of 3–807.3 which relate to the "prices set by law or regulation" exception from the requirement for the submission of cost or pricing data shall be applied in accordance with the above guidance; the provisions of 3–807.3 relating to the other exceptions are not affected by this paragraph.

S5–104.1 *The Termination as to Existence of Competition.*

(a) Although in most instances utility service suppliers operate in franchised territory, competition may nevertheless exist—for example, where more than one supplier is franchised for a given location, or where more than one supplier is able to provide service at a given location, but no supplier has yet been franchised for that location. Therefore, when the location of a new military installation has been determined and the procurement of utility services is authorized, the contracting activity shall determine whether more than one supplier can provide the service. Where competition exists, proposals shall be solicited from all potential suppliers. Even where one of the competing potential suppliers has entered into a GSA area contract, proposals shall be solicited to determine definitely which of the suppliers offers more advantageous competing services under the particular circumstances.

(b) Similarly, where an existing installation is being served by one supplier, and either another prospective supplier requests an opportunity to furnish the service or the Department concerned becomes aware of another potential supplier, the Department shall determine whether more than one supplier can provide the service. Where competition is found to exist, competitive solicitation of proposals shall be initiated at whatever time is considered to be most advantageous to the government.

The Eighth Circuit found that nothing in Supplement No. 5 mandated that Ellsworth follow state utility franchise law in procuring electrical service.

Finally, the Eighth Circuit addressed a proposed revision to the federal acquisition regulations initiated by the Department of Defense, General Services Administration, and National Aeronautics and Space Administration. *Id.* at 674. The proposed change required contracting officers to acquire utility services competitively in every instance without regard to the existence of state or local franchise service territories. *Id.* Congress subsequently adopted legislation that prevented the Department of Defense from using appropriated funds to implement or enforce the proposal. *Id.* In addition, the Eighth Circuit noted that "the Conference Committee has directed the Department of Defense 'not to implement additional changes effecting the purchasing of utilities until after they have been formally presented to and approved by the committee on appropriations in the House and Senate.' 132 Cong.Rec. H10728 (daily ed. Oct. 15, 1986)." *Id.*

The Court found that nothing in the new legislation changed Supplement No. 5 to require the federal government to defer to a state's regulation of franchise territories. *Id.* at 675. The Court interpreted the legislative history of the legislation as suggesting concern about a situation where a federal facility that obtains all of its electricity from a single utility would switch suppliers and abandon the local utility system that has already built the necessary distribution system. *Id.* The Court found that Ellsworth was not abandoning Black Hills' facilities, but rather, was making the most efficient use of the existing distribution system. *Id.* The Court held:

> Had Congress wanted to mandate that state franchise law governs the determination of when a utility is in a "sole source" position, it could easily have done so. Congress has specifically provided that agencies may use other than competitive procedures if a statute requires that procurement be from a specified source. 10 U.S.C. § 2304(c)(5). However, Congress has never enacted a statute requiring that the United States purchase utility service from local franchise utilities. Finding nothing in federal law that specifically directs such procurement, we cannot order Ellsworth to contract with Black Hills for the overrun electrical service to an exclusive federal enclave.

*Id.* at 675–76.

## DISCUSSION

### (a) Position of West River

West River takes the position that this Court would be premature in making a decision as to whether section 8093 is applicable to mandate the procurement of electricity in this case. It argues that since there is a legitimate dispute as to the territory between West River and Black Hills, the applicability of section 8093 is not ripe for consideration. West River opines that there never has been an established franchise or territory, arguing that West River also has service territory including Ellsworth; that Pullman abstention should be applied by the Court until resolution of the territorial disputes is complete, citing *Bob's Home Service, Inc. v. Warren County,* 755 F.2d 625 (8th Cir.1985).

This Court believes that abstention is not in order. If section 8093 applies to Ellsworth as a federal enclave, then the federal procurement officer would be required to obtain service from whichever supplier is designated by PUC. Indeed, from time to time the territories and hence suppliers may change by order of the PUC. If section 8093 does not apply, then the matter of territory designation becomes irrelevant.

### (b) Ellsworth—An Enclave

The fact that Ellsworth is a federal enclave is without question. *Weinberger* at 668, citing *Paul v. United States,* 371 U.S. 245, 263, 83 S.Ct. 426, 437, 9 L.Ed.2d 292 (1963). Unless section 8093 is a specific grant of jurisdiction to the South Dakota State Public Utilities Commission, it goes without saying that the PUC does not have the right to designate electrical service ter-

ritories over Ellsworth. Its October 31, 1988, order would be then a nullity.

This Court believes that its decision today draws strength from the teaching of *Weinberger*. *Weinberger* indeed is alive and well. The important distinction between a federal enclave comprising land ceded to the United States by the state and federal properties (i.e., post office, federal courthouses, federal office buildings, prisons) on state land is an important one necessary to preserve the balance between national and state powers and honors Congress's exclusive jurisdiction under the Constitution. *Weinberger* at 668, citing *Pacific Coast Dairy, Inc. v. Dept. of Agriculture of California*, 318 U.S. 285, 63 S.Ct. 628, 87 L.Ed. 761 (1943) and *Penn Dairies, Inc. v. Milk Control Comm'n of Pennsylvania*, 318 U.S. 261, 63 S.Ct. 617, 87 L.Ed. 748 (1943).

### (c) History of Section 8093

Turning to the question whether section 8093 is intended to apply to the Ellsworth federal enclave, the Court first examines the history of the legislation. The Court notes at the outset that *Weinberger* is nowhere mentioned, although it was decided approximately one year prior to the enactment of section 8093.[3] For that matter, the words "federal enclave" are not to be found in the legislation or the history. While this may not be of substantial note, it seems reasonable that if Congress intended the act to apply to federal enclaves, it would have been easy to say so. Accordingly, it appears that in the application of section 8093 to the facts of this case, section 8093 is not plain and unambiguous. It is therefore ambiguous.

Black Hills urges that "the language of section 8093 and the timing of its passage indicate that it was passed in response to the decision of the Eighth Circuit in *Black Hills Power & Light Co. v. Weinberger* ...." This Court is not so sure. Again, it would have been a simple matter to include such language had Congress desired to do so. Black Hills asserts in its brief that "[t]he Supremacy and Enclave Clause barriers to the 1985 PUC Order Laws have been removed by the subsequent curative legislation, § 8093." Again, this Court does not agree. Such a position sweeps with too broad a broom.

The Court, in examining the history of section 8093, notes that the congressional concern expressed was to protect utility abandonment by their federal customers. In this case, Black Hills was not a customer in the sense contemplated by Congress. Section 8093 was intended to protect remaining customers of utility systems from having to pay higher rates by reason of a loss of an existing customer. *See* S.Rep. No. 235, 100th Cong., 1st Sess. 70 (1987). *See also* H.R.Rep. No. 410, 100th Cong., 1st Sess. 277 (1987).

Finding that Ellsworth is a federal enclave and that section 8093 was not intended to apply obviates the necessity to discuss the various issues of state law. Further, such issues as res judicata, supremacy, preemption, and stare decisis have been mooted by the Court's holding.

### CONCLUSION

The Court concludes that Ellsworth continues to be a federal enclave. As a federal enclave, the Court concludes that section 8093 expresses no clear legislative intent to overrule *Weinberger*. Accordingly, the Court concludes that dismissal of these proceedings is in order.

### ORDER

In accordance with this Court's memorandum opinion, it is hereby

ORDERED that the actions Civ. 88–5151, Civ. 88–5152, Civ. 88–5153, and Civ. 89–5019 are dismissed with costs to be hereafter taxed by the Clerk against Black Hills Power and Light Company.

---

**3.** *Weinberger* was decided January 7, 1987, whereas section 8093 was enacted December 22, 1987.