**UNITED STATES of America,**
**Plaintiff,**

v.

**STATE CORPORATION COMMISSION OF the COMMONWEALTH OF VIRGINIA et al., Defendants.**

**Civ. A. No. 450–71–A.**

United States District Court,
E. D. Virginia,
Alexandria Division.

Argued May 19, 1972.

Decided July 20, 1972.

Jeffrey Alexrad, Dept. of Justice, for plaintiff.

Henry M. Massie and Vann Lefcoe, Asst. Attys. Gen., of Virginia (Andrew P. Miller, Atty. Gen., of Virginia) and Joseph E. Blackburn for defendants.

Paul Rodgers, Gen. Counsel, Washington, D. C., for National Ass'n of Regulatory Utility Commissioners, amicus curiae.

Before CRAVEN, Circuit Judge, and LEWIS and MacKENZIE, District Judges.

MacKENZIE, District Judge:

In the fall of 1971, the State Corporation Commission of Virginia granted to the Chesapeake and Potomac Telephone Company of Virginia a general increase for services to its telephone subscribers in Virginia.

Affected by that increase, obliquely,[1] but materially, is the United States Government, in the new charges for telephone services to be rendered to it,[2]

---

1. The "foreign zone" rate applicable to the Pentagon was not increased per se, but a proviso that the "foreign zone" rate to be paid would not be less than the rate charged a Virginia subscriber for service in the same geographical area is effective to increase charges.

2. 56 Va.Code Ann. § 232, Chapter 195, Acts of Virginia Assembly of 1964 empowered the Virginia State Corporation Commission to regulate rates for telephone service rendered in Virginia to the United States Government.

principally at the Pentagon Building in Virginia.

A restraining order was sought and granted against the rate increase as it affects the United States, pending this decision.

It is the contention of the plaintiff that the 1971 rate increase granted by the Virginia State Corporation Commission is ineffective to impose such increase upon the United States because it is (1) contrary to the terms of an alleged agreement made in 1966 between Chesapeake and Potomac Telephone Company of Virginia and the United States, and (2) that the rate increase in this case is violative of the Supremacy Clause of the United States Constitution.[3] The defendants, State Corporation Commission of Virginia and the Chesapeake and Potomac Telephone Company of Virginia, (1) deny any 1966 contract, and further claim (2) that even if there were such a contract, no provision therein denies the applicability of the rates as fixed by the Virginia State Corporation Commission, and (3) that there is no federal statute or federal policy against the payment by the United States of State prescribed telephone rates that could here invoke the Supremacy Clause.

The contentions as to whether the 1966 negotiations between the parties was a contract and the meaning of certain of its terms, if a contract, is largely a question of fact and evidence.

I

THE ALLEGED 1966 CONTRACT

The alleged contract document is a looseleaf notebook having imprinted on its cover, "Designs in Communications For . . . Department of Defense. Prepared by the Chesapeake & Potomac Telephone Company, Washington, D.C." On the first inside page the study is designated "A Communications Proposal For . . . Washington Metropolitan Area Consolidation." [4] The Government contends that this was an offer made by the Chesapeake and Potomac Telephone Company which the Government accepted by letter in October, 1966.[5]

■ We do not agree that the booklet, "Designs in Communications, etc. . . . A Communication Proposal, etc." was an offer of a contract on the part of Chesapeake and Potomac Telephone Company which the Government could summarily accept. In short, the Government has failed to carry the burden of proof that such looseleaf notebook was anything more than a sales brochure prepared at the request of the Government for a "study".[6]

The entire format of the Chesapeake and Potomac Telephone Company "communication proposal" suggests that it is only a report of findings as to efficiency, cost, locations, and procedures of the then current telephone system and a summary of proposals for consolidation in the future, including a general comparative cost analysis. The evidence is clear that such *proposals* are prepared regularly as an accommodation for presenting in graphic form the economic and technical feasibility of a suggested telephone system to customers with a particular need. Since 1959, the Department of Defense itself had been looking to long range consolidation of its communication facilities and had requested, and received, many similar Chesapeake and Potomac Telephone Company studies. None of such earlier studies had been treated as an offer to be accepted or rejected.

Section 1.309 of the Armed Services Procurement Regulations (A.S.P.R.) provides specifically for the Government's "Solicitations for Informational or Planning Purposes". That procurement regulation carries no implication

3. U.S. Constitution, Article VI, Clause 2.

4. Exhibit 7.

5. Exhibit 9.

6. Assistant Secretary of Defense Ignatius' request of May, 1965, was for a "study . . . at no cost to the Government."

that solicited studies are to be treated as binding contractual offers.

The failure of the "Design in Communications Study" to contain any of the rudimentary boiler plate contract clauses which are the delight of every Government lawyer, and explicitly required by many federal statutes, is but further evidence that this was not an offered contract. As stated, the evidence fails to sustain the Government's claim that the 1966 study and proposal was an offer of a contract which it could accept.

## II

### RATE UNDER THE ALLEGED CONTRACT

Even if we assume for the sake of argument that the 1966 Proposal was an offer by the Chesapeake and Potomac Telephone Company which was accepted by the Government, there is nothing in that agreement to exempt the United States from the payment of the approved Virginia rate for the telephone service rendered to the Pentagon.

The 1966 Proposal (Exhibit 7) contains the following language:

"Centrex stations . . . [The Pentagon] . . . located in the Oxford Zone [Arlington County, Virginia] will be Washington rated".

It is stipulated that the service to be rendered to the Oxford Zone (Pentagon) is foreign zone service. The Government claims that "Washington rated" would preclude the applicability of the Virginia tariff.

Defined, "foreign zone" service is an arrangement whereby a telephone customer physically located in one area (zone) may obtain a telephone exchange characteristic of another geographical area. The Pentagon, located as it is in Virginia, requires telephone service with exchange characteristics of Washington, D. C.—a "foreign zone" to its "normal", or actual geographic location. The typical rate charged for "foreign zone" service is (as in the case here) the base rate in the distant foreign zone plus a mileage charge from the actual location of the telephone to the boundary line of the foreign zone whose exchange characteristics the telephone requires.

Relating this to the Pentagon, its requirements for foreign zone service would typically be billed on the basis of the Washington, D. C. base rate plus mileage computed on the distance from the District of Columbia to the telephone equipment in Virginia. It is conceded that this is, in fact, the rate paid by the Pentagon for service since its construction in 1942. Thus Pentagon service, since 1942, is "Washington rated" but the Washington rate as such is only one input into the formula for foreign zone charge. This charge, paid by the United States since 1942 is also the Chesapeake and Potomac Telephone Company of Virginia rate for foreign zone service to all of its customers in the area as established by the Virginia State Corporation Commission.

It would be foolhardy to suggest that a telephone subscriber in Virginia could be charged a rate established for Washington, D. C. To do so would be to hold that the rate thus charged in Virginia was based upon the totally irrelevant costs and investment structure of the Chesapeake and Potomac Telephone Company of Washington in Washington, as established by the District of Columbia Public Service Commission. The Government concedes in its brief, and on argument, that "Washington rated", as contained in the 1966 proposal, did not mean to it only the base Washington rate, but included the mileage charge.

■ We conclude that "Washington rated" means what it has meant since 1942, that the Washington base rate would continue to be a part of the formula upon which foreign zone charges are to be computed for telephone service at the Pentagon and in Arlington County, Virginia (the Oxford Zone), as, in fact, that charge is computed and approved for all Virginia foreign zone subscribers in the same geographical area. Such charge is "Washington rated" and is the Virginia foreign zone rate.

And indeed it is indicative that the Government intended to pay the approved Virginia rate from this unequivocal statement which appears in the 1966 proposal:

"The entire system will be installed, owned and maintained by the Chesapeake and Potomac Telephone Company *under the provisions of tariffs filed with the appropriate regulatory commission.*" (Under Tab, Proposed System, 1966 Proposal, Exhibit 7.) [Emphasis added.]

This is entirely consistent with the existing telephone procurement arrangements for Pentagon telephone service, in our opinion, still in effect, which were concluded as a contract in 1950, and in which it was agreed that the Chesapeake and Potomac Telephone Company would provide such service as was regularly offered to subscribers in the area at " . . . the rates, terms and conditions in regularly established tariffs".[7]

To be sure, the foreign zone rate approved by the State Corporation Commission does provide that the charge to the Government shall be no less than the rate charged a Virginia telephone subscriber in the same geographical area. It cannot be argued that this is discriminatory, but discrimination would certainly exist if the telephone service to the Government, in Virginia, was charged on Washington, D. C. rates.

Telephone rates in Virginia are established by the State Corporation Commission[8] on the basis of (a) the value of the Company's property used in its intrastate service, (b) gross revenues, and (c) operating costs, all as reflected to allow a reasonable rate of return on investment. Virginia customers are then charged on the basis of the rates so determined. The equipment, its service and maintenance at the Pentagon are all owned and furnished by the Chesapeake and Potomac Telephone Company of Virginia, and included in the rate making

formula affecting Virginia customers. It would be manifestly a rank discrimination to have those Virginia customers pay higher charges to underwrite a less than fair rate charged to the United States, a rate based on telephone property values, incomes and costs in Washington, D. C.

"Washington rated", as we interpret it, therefore, would not indicate any departure from the Government's payment of the established Virginia tariff for foreign zone services.

### III

### SUPREMACY CLAUSE

The United States lastly claims that the telephone rates now to be charged the United States for service to its Virginia component, the Pentagon, and which the State Corporation Commission has stated shall not be less than the charges to similarly geographically situated Virginia customers, constitutes an interference with vital governmental operations in violation of the Supremacy Clause of the United States Constitution. It is true that by paying no less than Virginia customers similarly geographically situated, the United States will pay substantially more than it previously did.

Article III, Clause II of the United States Constitution reads in relevant portion:

"This Constitution, and the Laws of the United States . . . shall be the Supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the contrary notwithstanding."

This clause was intended to eliminate the right of any state to regulate operations of the Federal Government, without its express consent. McCulloch v. Maryland, 17 U.S. 316, 4 Wheat. 316, 4 L.Ed. 579 (1819). There is no claim by the United States, here, that the State

7. Exhibit 2, Paragraphs 1(d), 3, 10(a).

8. Norfolk v. Chesapeake, Potomac Telephone of Virginia, 192 Va. 292, 64 S.E.2d 772 (1951).

Corporation Commission is seeking to directly tax or regulate Federal Governmental operations in a discriminatory manner. The Government pays the same rate as all others and no less than that of a basic subscriber in the same "Oxford Zone".

In order to successfully urge its Supremacy Clause claim, the United States must show a conflict between the state law involved and some federal statute or defined federal policy. Penn Dairies v. Milk Control Commission of Pa., 318 U. S. 261, 63 S.Ct. 617, 87 L.Ed. 748 (1943). In *Penn, supra* the Supreme Court, answering Federal challenges to state price regulation on milk sold to the Government announced:

> "Hence, *in absence of some evidence of an inflexible Congressional policy* requiring government contracts to be awarded on the [lowest bid despite noncompliance with] state regulations . . . *we cannot say that* the . . *milk commission regulation conflicts with Congressional legislation or policy and must be set aside merely because it increases the price of milk to the government."* [Emphasis supplied.]

The Supreme Court has continued to require a showing, in Supremacy cases, that the constitutionally questioned state law or regulation conflicts with federal statute or policy. United States v. Georgia Public Service Commission, 371 U.S. 285, 83 S.Ct. 397, 9 L.Ed.2d 317 (1963); Paul v. United States, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963); Public Utilities Comm'n. of Calif. v. United States, 355 U.S. 534, 78 S.Ct. 446, 2 L. Ed.2d 470 (1958); Arizona v. California, 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154 (1931).

▇ We find no relevant Federal statute that conflicts with the 1971 State Corporation Commission order.

We find, furthermore, that there is no discernible Federal policy relevant to procurement of telephone services that would be offended by enforcement of the Virginia State Corporation Commission order as to the Government and in fact, recognition of the Virginia tariff is, and has been, the government policy.

The United States points to its past practice of purchasing "foreign zone" service at what it calls "Washington rates" as evidence of a Federal policy opposed to Government purchase of telephone service at established tariffs. But as noted earlier, the United States has always paid the Washington base rate plus mileage for "foreign zone" service in the Oxford Zone. Payment for "foreign zone" service at a rate based on that formula (Washington base rate plus mileage) was, in fact, payment of regularly established Virginia tariff rates. The Government, therefore, points up a policy of compliance with regularly established tariffs rather than one of non-compliance.

In addition, Armed Forces Procurement Regulations, Part 10, § 22–1003 (9th Rev., April 1971) expresses a clear federal policy of compliance with regularly established tariffs in the purchase of telecommunications services:

> "In accordance with instructions contained in Department of Defense directives . . . *the Department of Defense generally procures communications services . . . in accordance with tariff provisions, and tariff rates established . . . with . . . appropriate governmental bodies* unless costs or other operational requirements dictate otherwise." [Emphasis supplied.]

It is also noteworthy that federal policy, as stated in A.S.P.R. for procurement of telecommunications services (§ 22–1003) is set out in a separate section from the A.S.P.R. policy statement regarding procurement of other utilities. (A.S.P.R., Ch. 1, § 1–4.401). This, it would seem, indicates an effort by the Federal Government to clarify and define, in particular, its policy for purchase of telecommunications.

All prior General Government contracts for procurement of telephone services at the Pentagon have indicated

a Federal policy of compliance with regular tariffs. The most recent of these contracts, entered into by C & P and the Defense Department in 1950, states in paragraph 10(a) of the contract:

"10. Subject, if required by law, to approval by governmental regulatory agencies having jurisdiction with respect to telephone companies the Department shall pay . . . for facilities and services furnished by it under this contract amounts determined as follows:

(a) For any of the regular classes of service . . . an amount equal to the rates and charges for the service under the Company's established regulations." ["Established regulations" are defined as terms and conditions of regularly established tariffs.][9]

This contractual provision serves to reaffirm our conclusion that the Federal policy in procurement of telephone services is a commitment to the payment of established tariffs approved by appropriate regulatory commissions. And since we find that there was no contractual agreement formed in 1966, any consolidated services provided after that date were furnished pursuant to the 1950 General Contract quoted from above. That contract, as stated above, declared the Government's intention to pay tariffs "subject, if required by law, to approval by Governmental regulatory agencies having jurisdiction with respect to telephone companies . . . ."

The absence of any evidence that there is a Federal policy dictating procurement of telecommunications at rates other than regularly established tariffs renders defective the United States' Supremacy claim. *Penn Dairies, supra.*

The Government argument that the 1966 alleged contract can be used to establish a Federal policy of exemption from regularly established tariff rates, is simply not in accord with the previous history of telephone service at the Pentagon, nor with the Government's own pronouncements. Moreover, neither in its brief nor in response to questioning at oral argument does the government point to a single instance of Defense Department procurement of telephone service anywhere in the nation at other than regular tariff rates of the appropriate regulatory agency.