918 F.2d 713
 118 P.U.R.4th 510
 WEST RIVER ELECTRIC ASSOCIATION, INC., Appellee,
v.
BLACK HILLS POWER AND LIGHT COMPANY, Appellant,
and
Ellsworth Air Force Base.
BLACK HILLS POWER AND LIGHT COMPANY, Appellant,
v.
HEARTLAND CONSUMERS POWER DISTRICT, Appellee.
WEST RIVER ELECTRIC ASSOCIATION, INC., Appellee,
v.
BLACK HILLS POWER AND LIGHT COMPANY, Appellant,
and
Ellsworth Air Force Base.
In the Matter of the Complaint of WEST RIVER ELECTRIC
ASSOCIATION, INC., against Black Hills Power and
Light Company and Ellsworth Air Force Base.
In the Matter of the Complaint of BLACK HILLS POWER AND
LIGHT COMPANY against Heartland Consumers Power
District with Regard to Electric Service
to Ellsworth Air Force Base.
WEST RIVER ELECTRIC ASSOCIATION, INC., Appellant,
v.
BLACK HILLS POWER AND LIGHT COMPANY and Ellsworth Air Force
Base, Appellees.
WEST RIVER ELECTRIC ASSOCIATION, INC., Appellant,
v.
BLACK HILLS POWER AND LIGHT COMPANY and Ellsworth Air Force
Base, Appellees.
WEST RIVER ELECTRIC ASSOCIATION, INC., Appellant,
v.
BLACK HILLS POWER AND LIGHT COMPANY and Ellsworth Air Force
Base, Appellees.
BLACK HILLS POWER AND LIGHT COMPANY,
v.
HEARTLAND CONSUMERS POWER DISTRICT.
In the Matter of the Complaint of WEST RIVER ELECTRIC
ASSOCIATION, INC., against Black Hills Power and
Light Company and Ellsworth Air Force Base.
In the Matter of the Complaint of BLACK HILLS POWER AND
LIGHT COMPANY against Heartland Consumers Power
District with Regard to Electric Service
to Ellsworth Air Force Base.
 Nos. 89-5443, 89-5468.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 13, 1990.
Decided Nov. 2, 1990.
Rehearing and Rehearing En Banc
Denied Dec. 31, 1990.
 
 David Morrill, Rapid City, S.D., for appellant.
 Vincent Protsch, Madison, S.D., for appellee.
 Before MAGILL, Circuit Judge, ROSS, Senior Circuit Judge, and LARSON,* Senior District Judge.
 ROSS, Senior Circuit Judge.
 
 
 1
 Black Hills Power and Light Company (Black Hills) appeals from a judgment of the district court[1] which held that Congress has not clearly and specifically deferred its exclusive jurisdiction over Ellsworth Air Force Base (Ellsworth), a federal enclave, sufficient to require that Ellsworth comply with South Dakota law in the procurement of its utility services. The district court concluded that Black Hills does not have the exclusive right to supply overrun electricity to Ellsworth and that instead Ellsworth may competitively purchase that electricity.
 
 
 2
 This case involves the second attempt on the part of Black Hills to secure the exclusive right, as conferred upon it by state law,[2] to provide electric service to Ellsworth. See Black Hills Power & Light Co. v. Weinberger, 808 F.2d 665 (8th Cir.) ("Weinberger"), cert. denied, 484 U.S. 818, 108 S.Ct. 73, 98 L.Ed.2d 36 (1987). The central issue presented on appeal is whether, by virtue of the Continuing Appropriations Act, Fiscal Year 1988, Pub.L. No. 100-202, Sec. 8093, 101 Stat. 1329, 1329-79 (1987) ("section 8093"), Ellsworth Air Force Base must follow the utility franchise territories prescribed by South Dakota law in procuring its electrical service. We conclude that as a federal enclave, Congress has exclusive jurisdiction[3] over Ellsworth Air Force Base and that in order to defer this exclusive jurisdiction to the State, Congress must clearly and unambiguously express as its purpose the deferral of such jurisdiction. We conclude that section 8093, as part of an appropriations bill, is insufficient to defer the exclusive grant of federal jurisdiction, nor was it intended to amend the extensive body of federal procurement law which establishes that federal agencies must use full and open competitive procedures in the procurement of their property and services.
 
 I.
 
 3
 Ellsworth Air Force Base is a military installation of the United States Air Force located in parts of Meade and Pennington Counties, South Dakota. Of the 4,856.76 acres occupied by Ellsworth, approximately 88% has been ceded by South Dakota to the exclusive jurisdiction of the United States. Weinberger, supra, 808 F.2d at 666.
 
 
 4
 The dispute which gave rise to this action originated in 1984, when the United States solicited bids for supplying the overrun electric power to Ellsworth. Prior to 1984, Ellsworth's main base electric power needs were met by an agency of the United States Department of Energy, the Western Area Power Administration (WAPA). However, in 1984, WAPA determined that it could no longer meet the needs of Ellsworth and thus the United States undertook to supply these overrun electricity needs through the solicitation of bids. Five suppliers submitted bids, including Black Hills, and Ellsworth chose the lowest bid, that of Heartland Consumers Power District. Accordingly, the United States and Heartland entered into a one-year contract in October, 1984.[4]
 
 
 5
 On November 24, 1984, Black Hills filed a complaint with the South Dakota Public Utilities Commission ("Commission") arguing that Ellsworth is located in Black Hills' utility service territory, as established by state law, and therefore Ellsworth is required to obtain its overrun electric power from Black Hills. Following a three-day evidentiary hearing, the Commission found that under South Dakota law, Black Hills is entitled to be the exclusive provider of electric service to Ellsworth. Following removal to federal court, the district court held that there was a conflict between state and federal law, and that the supremacy clause, U.S. Const., art. VI, cl. 2, prevented the Commission from forcing the United States to contract with a specified electric utility. Additionally, the court determined that the Commission lacked jurisdiction over Ellsworth because Ellsworth is an exclusive federal enclave.
 
 
 6
 On appeal, the Eighth Circuit affirmed the district court's decision, finding that (1) Ellsworth is a federal enclave under exclusive federal jurisdiction; (2) nothing in federal procurement law directed Ellsworth contracting officials to follow state utility franchise law; and (3) none of the legislation enacted by Congress constituted a deferral of the exclusive federal jurisdiction. Weinberger, supra, 808 F.2d at 666.
 
 
 7
 Subsequent to the Supreme Court's denial of the petition for writ of certiorari in Weinberger, Congress passed an Act which contained a prohibition on the use of appropriated funds by any federal department, agency, or instrumentality in the procurement of electricity in a manner inconsistent with state law. Section 8093, supra.[5]
 
 
 8
 Nine months after the passage of section 8093, Black Hills filed a motion with the South Dakota Public Utilities Commission, seeking reinstatement of its 1985 order, which required Ellsworth to purchase its overrun power from Black Hills in accordance with state law. Four days later, West River Association, Inc. filed a complaint with the Commission alleging that, because of a service territory boundary dispute, West River was entitled to be the sole supplier of overrun electric power to Ellsworth. These cases were consolidated and a hearing was held on September 29, 1988. On October 31, 1988, the Commission reinstated its 1985 order, requiring Ellsworth to acquire its excess power from Black Hills and to terminate the service contract between Ellsworth and Heartland. On August 14, 1989, the federal district court entered a memorandum opinion and order which held that, because Ellsworth is a federal enclave, the dictates of section 8093 do not apply. The court concluded that Weinberger continues to accurately state the law. This appeal followed.
 
 II.
 
 9
 The Supreme Court has explicitly held that "the grant of 'exclusive' legislative power to Congress over enclaves that meet the requirements of Art. I, Sec. 8, cl. 17, by its own weight, bars state regulation without specific congressional action." Paul v. United States, 371 U.S. 245, 263, 83 S.Ct. 426, 437, 9 L.Ed.2d 292 (1963). With regard to the Supremacy Clause of the Constitution,[6] the Supreme Court has stated: "Because of the fundamental importance of the principles shielding federal installations and activities from regulation by the States, an authorization of state regulation is found only when and to the extent there is 'a clear congressional mandate,' 'specific congressional action' that makes this authorization of state regulation 'clear and unambiguous.' " Hancock v. Train, 426 U.S. 167, 179, 96 S.Ct. 2006, 2013, 48 L.Ed.2d 555 (1976) (citations omitted); see also Citizens & Landowners v. Secretary, 683 F.2d 1171, 1178 (8th Cir.1982). "Particular deference should be accorded ... where, as here, the rights and privileges of the Federal Government at stake not only find their origin in the Constitution, but are to be divested in favor of and subjected to regulation by a subordinate sovereign." Hancock, supra, 426 U.S. at 179, 96 S.Ct. at 2012-13.
 
 
 10
 Here, the fact that Ellsworth is a federal enclave is without question. Weinberger, supra, 808 F.2d at 668. Unless section 8093 constitutes a specific grant of jurisdiction to the South Dakota State Public Commission, it is incontrovertible that the Commission does not have the authority to require Ellsworth to follow state utility service territories in purchasing electricity.
 
 
 11
 Black Hills argues that section 8093 constitutes a sufficiently "clear and unambiguous" congressional mandate which defers to state regulation the exclusive jurisdiction of the federal government over federal enclaves and prohibits Ellsworth from procuring utility services through competitive bidding. The district court rejected Black Hills' position, noting that section 8093 does not specifically include a "federal enclave" as an entity which must defer to state law in the procurement of its electric services. The district court found that because "federal enclaves" are not clearly included in the scope of section 8093, that section is ambiguous as applied to the facts of this case. The court concluded that section 8093 does not confer upon Black Hills the exclusive right to supply electric service to Ellsworth.
 
 
 12
 The district court then looked to the legislative history of the Act and found that it was congressional concern to protect utilities against abandonment by their federal customers. "Section 8093 was intended to protect remaining customers of utility systems from having to pay higher rates by reason of a loss of an existing customer." West River Elec. Assn. v. Black Hills Power & Light Co., 719 F.Supp. 1489, 1499 (D.S.D.1989) (citing S.Rep. No. 235, 100th Cong., 1st Sess. 70 (1987); H.R.Rep. No. 410, 100th Cong., 1st Sess. 277 (1987)). The district court found that Ellsworth was not already a Black Hills' customer, and concluded that section 8093 was not intended to apply to Ellsworth.
 
 
 13
 Because we have previously discussed in detail the provisions of federal law which require the pursuit of active competition in the procurement of property and services by agencies of the federal government, see Weinberger, supra, 808 F.2d at 671-72, we will not repeat that discussion here. Suffice it to say that federal procurement law is specifically designed to ensure "active competition so that the United States may receive the most advantageous contract." Paul, supra, 371 U.S. at 253, 83 S.Ct. at 432. The general rule is the promotion of "full and open competition in soliciting offers and awarding Government contracts." 48 C.F.R. Sec. 6.101 (1985) (citing 10 U.S.C. Sec. 2304.)
 
 
 14
 Under the Competition in Contracting Act of 1984, 10 U.S.C. Secs. 2301-2316 (1988), the procurement of electric service at Ellsworth must be conducted on a competitive basis if competition is present, and the determination of whether competition is present is left to the discretion of the Air Force:
 
 
 15
 [I]t is in the interest of the United States that property and services be acquired for the Department of Defense in the most timely, economic, and efficient manner. It is therefore the policy of Congress that--
 
 
 16
 (1) full and open competitive procedures shall be used by the Department of Defense in accordance with the requirements of this chapter;
 
 
 17
 * * * * * *
 
 
 18
 (5) the head of an agency use advance procurement planning and market research and prepare contract specifications in such a manner as is necessary to obtain full and open competition with due regard to the nature of the property or services to be acquired.
 
 
 19
 Id. at Sec. 2301(a). Furthermore, the "procurement policies and procedures," for the military department in particular, shall "promote full and open competition." Id. at Sec. 2301(b).
 
 Congress further provided that:
 
 20
 [T]he head of an agency in conducting a procurement for property or services--
 
 
 21
 (A) shall obtain full and open competition through the use of competitive procedures ...; and
 
 
 22
 (B) shall use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement.
 
 
 23
 Id. at Sec. 2304(a)(1). In determining the appropriate "competitive procedure," the agency may solicit sealed bids or request competitive proposals. Id. at Sec. 2304(a)(2). Significantly, the exceptions to this mandatory requirement to seek competition are discretionary. See, e.g., id. at Sec. 2304(c) (Under specified circumstances, "[t]he head of an agency may use procedures other than competitive procedures.") (emphasis added).
 
 
 24
 Within this basic framework of the enclave clause and federal procurement law, we now turn to the specific arguments of the parties.
 
 III.
 
 25
 Black Hills contends that Congress need not specifically defer its exclusive jurisdiction over a federal enclave to state regulation. As an example, Black Hills contends that in Offutt Hous. Co. v. County of Sarpy, 351 U.S. 253, 76 S.Ct. 814, 100 L.Ed. 1151 (1956), the Supreme Court determined that a federal enclave was subject to regulation by the state, notwithstanding the fact that the federal legislation did not specifically permit state regulation of property subject to the exclusive legislation by Congress. Id. at 259, 76 S.Ct. at 818.
 
 
 26
 Black Hills' reliance on Offutt, however, is misplaced. In Offutt, the state regulation, in the form of state property taxes, was directed against a private party who leased land on an Air Force base from the federal government in order to establish military and civilian housing. The Court held that through legislation, Congress had consented to the state taxation of the lessee, even though the property involved was subject to the exclusive jurisdiction of the federal government.
 
 
 27
 In its reasoning, the Court relied on cases which had established an exception to the federal enclave clause where a state tax was levied against a private party who had taken over the beneficial use of federal property, even though legal title might remain in the United States. Id. at 257, 76 S.Ct. at 817 (citing S.R.A., Inc. v. Minnesota, 327 U.S. 558, 564, 66 S.Ct. 749, 753, 90 L.Ed. 851 (1946), ("We shall treat this case as though the Government's unrestricted transfer of property to nonfederal hands is a relinquishment of the exclusive legislative power."), and Baltimore Shipbuilding Co. v. Baltimore, 195 U.S. 375, 382, 25 S.Ct. 50, 51, 49 L.Ed. 242 (1904), ("[I]t seems to us extravagant to say that an independent private corporation for gain ... is exempt from state taxation ... because it is employed by the United States ...")). In contrast, while Offutt involved the state regulation of a private party who leased land from the government, the state regulation in the instant case is directed against the federal government itself.[7]
 
 
 28
 Similarly, Black Hills' reliance on United States v. State Corp. Comm'n, 345 F.Supp. 843 (E.D. Va.1972), aff'd, 409 U.S. 1094, 93 S.Ct. 912, 34 L.Ed.2d 682 (1973), to support its argument that the Commission can regulate a federal enclave without specific congressional approval is also unfounded. The district court in State Corp. Comm'n did not even address the federal enclave issue and the Supreme Court affirmed without opinion. The State Corporation Commission's assertion of the enclave issue in its Jurisdictional Statement to the Supreme Court is insufficient to create a binding holding that a state can regulate a federal enclave without specific congressional approval. See Mandel v. Bradley, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977) ("a summary affirmance is an affirmance of the judgment only" and "[s]ummary actions ... should not be understood as breaking new ground but as applying principles established by prior decisions to the particular facts involved.")
 
 
 29
 Contrary to Black Hills' argument, it is well established that in order for Congress to subject a federal enclave to state jurisdiction, there must be a specific congressional deferral to state authority over federal property. For example, in Howard v. Commissioners, 344 U.S. 624, 627-28, 73 S.Ct. 465, 467, 97 L.Ed. 617 (1953), the statute in question specifically permitted a state income tax on persons residing or working in a "Federal area." Similarly, in Evans v. Cornman, 398 U.S. 419, 424, 90 S.Ct. 1752, 1756, 26 L.Ed.2d 370 (1970), the Court referred to 26 U.S.C. Sec. 3305(d), which permits state unemployment compensation law to be applied to services performed on "land or premises owned, held, or possessed by the United States." In Evans, the Court also referred to 40 U.S.C. Sec. 290, which permits states to apply workmen's compensation laws to "lands and premises owned or held by the United States." Evans, supra, 398 U.S. at 424, 90 S.Ct. at 1756. See also 4 U.S.C. Sec. 104 (gasoline and fuel taxes on military reservations); 4 U.S.C. Sec. 105 (sales tax on "Federal area").
 
 
 30
 Section 8093 contains no such specific reference to federal land or area, but instead is a general directive that federal agencies and installations follow state law in the procurement of their electric service. Hence, we conclude that Congress, through section 8093, has not provided the necessary clear authorization to defer its exclusive jurisdiction over Ellsworth and to apply in its stead the South Dakota utility service territories as established under South Dakota law.
 
 
 31
 Nor are we able to find in section 8093, on its face or in relation to the Appropriations Act as a whole, or from the legislative history, any clear and unambiguous declaration by Congress to amend the extensive and carefully-crafted body of federal procurement law. In fact, nowhere in section 8093 or its legislative history is the Competition in Contracting Act mentioned. Furthermore, as previously noted, the legislative history clearly states that this legislation was intended to protect against utility abandonment by their federal customers. It is undisputed that no abandonment is occurring here.
 
 
 32
 Finally, we note as significant the fact that section 8093 is only one small provision contained within an extensive appropriations law. While Congress can amend substantive legislation through a provision in an appropriations act, it is well established that "indefinite congressional expressions cannot negate plain statutory language and cannot work a repeal or amendment by implication." St. Martin Evangelical Lutheran Church v. South Dakota, 451 U.S. 772, 788, 101 S.Ct. 2142, 2151, 68 L.Ed.2d 612 (1981). "The doctrine disfavoring repeals by implication 'applies with full vigor when ... the subsequent legislation is an appropriations measure.' " Tennessee Valley Auth. v. Hill, 437 U.S. 153, 190, 98 S.Ct. 2279, 2300, 57 L.Ed.2d 117 (1978) (quoting Committee for Nuclear Responsibility v. Seaborg, Inc., 463 F.2d 783, 785 (D.C.Cir.1971) (emphasis in original)).
 
 
 33
 In view of the obvious congressional awareness of the requirement of clear and specific language to bind the United States, see United States v. United Mine Workers, 330 U.S. 258, 272-73, 67 S.Ct. 677, 685-86, 91 L.Ed. 884 (1947), we conclude that with respect to subjecting federal enclaves to state utility territories, section 8093 does not satisfy the traditional requirement that such intention be expressed with sufficient clarity. Should this be the objective of Congress, it need only amend the Act to make its intention apparent. Absent such amendment, we can only conclude that in enacting section 8093, Congress sought to submit federal installations and other federal agencies to state regulation in the procurement of utility service, while refraining from subjecting a federal enclave, a constitutionally-created entity, to such state control.
 
 
 34
 The court concludes that Ellsworth Air Force Base is a federal enclave over which Congress has exclusive jurisdiction as provided by the Constitution. Section 8093 does not clearly evince the necessary congressional intent to defer this jurisdiction to state law.[8] The judgment of the district court is affirmed.
 
 
 35
 MAGILL, Circuit Judge, dissenting.
 
 
 36
 I respectfully dissent from the majority opinion because I believe that Sec. 8093's plain language and legislative history, as well as the relevant Supreme Court precedent, supports the construction that Sec. 8093 applies to federal enclaves.
 
 
 37
 When a court is faced with an issue of statutory interpretation, it must first look to the words of the statute. Section 8093 states:
 
 
 38
 None of the funds appropriated or made available by this or any other Act with respect to any fiscal year may be used by any Department, agency, or instrumentality of the United States to purchase electricity in a manner inconsistent with State law governing the provision of electric utility service, including State utility commission rulings and electric utility franchises or service territories established pursuant to State statute, State regulation, or State-approved territorial agreements:....
 
 
 39
 Act of Dec. 22, 1987, Pub.L. No. 100-202, Sec. 8093, 101 Stat. 1329-79 (emphasis added). A simple reading of the statute belies the majority's claim that Sec. 8093 does not apply to Ellsworth Air Force Base. The statute explicitly prohibits the use of appropriated funds for electrical purchases where such purchases would violate state law. Here, under state law, Black Hills possesses the exclusive right to provide electricity to the territory in which Ellsworth is located. If Ellsworth were to purchase its overrun power from any other entity, the base would violate the plain language of Sec. 8093.
 
 
 40
 The legislative history of Sec. 8093 also supports this construction. The majority opinion cites only one line from the House and Senate Reports that accompanied Sec. 8093's enactment. In citing this one line as dispositive, however, the majority ignores the clear tenor of the reports. Because the legislative history so strongly supports the appellant's arguments, it is worth quoting at length:
 
 
 41
 The Federal Power Act of 1935 divided regulatory responsibility over the provision of electric service between federal and state regulatory bodies, specifically leaving retail rate and service regulation to the jurisdiction of the states and asserting federal jurisdiction over wholesale rate and service regulation. This jurisdiction is vested now in the Federal Energy Regulatory Commission (FERC). Proposals by federal executive agencies to purchase power competitively, without regard to the separation of state and federal regulatory authority or to the means by which states have divided responsibility for serving customers, is contrary to the regulatory framework Congress, and, derivatively, the states, have so carefully designed. This provision restores the federal and state regulatory authority over electric utility rates and service.
 
 
 42
 Generally, retail electric utility service is provided by suppliers authorized to serve within service territories. Authorization to provide service within these areas typically is derived through state law, either by statute or by delegation to a regulatory commission, or through delegation to a political subdivision of the state.
 
 
 43
 Whether through a service territory, a franchise, a service-related permit, a certificate of public convenience and necessity, a territorial agreement, or other means, retail electric utility service usually is provided by one supplier within any given area. This provision directs the federal government when procuring retail electric utility service, to abide by these service arrangements just like any other customer of an electric utility.
 
 
 44
 H.R.Rep. No. 410, 100th Cong., 1st Sess. 277 (1987) (emphasis added); see also S.Rep. No. 235, 100th Cong., 1st Sess. 70-72 (1987) (containing the same language and further expressing the primacy of the state regulatory framework). With due respect, it fairly stretches the bounds of credulity to assert that this legislative history does not clearly indicate that Congress intended to eliminate competitive bidding in the federal retail procurement of electricity.
 
 
 45
 The majority opinion not only ignores the plain language and legislative history of Sec. 8093, but also misinterprets the relevant Supreme Court precedent. The majority opinion distinguishes Offutt Hous. Co. v. County of Sarpy, 351 U.S. 253, 76 S.Ct. 814, 100 L.Ed. 1151 (1956), by essentially limiting the case to its facts, i.e., "the state regulation of a private party who leased land from the government." This approach ignores the central issue the Offutt Court decided. In Offutt, the Court was presented with the same issue this court faces today: whether Congress has consented to a state regulation that conflicts with the Constitution's federal enclave clause. Id. at 257, 76 S.Ct. at 817. The congressional statute at issue in Offutt, like Sec. 8093, did not include the words "federal lands," or "federal enclaves." Justice Frankfurter explicitly noted that the challenged statute "does not refer specifically to property in an area subject to the power of 'exclusive legislation' by Congress." Id. at 259, 76 S.Ct. at 818 (emphasis added). He concluded, however, based on the statute's language, purpose, and legislative history, that Congress had consented to the state regulation. Id. at 259-61, 76 S.Ct. at 818-19.
 
 
 46
 The Offutt case squarely presented the Supreme Court with the issue now before this court, namely, whether the talismanic words "federal lands" or "federal enclaves" need to be included in a statute where Congress has clearly and unambiguously indicated its desire to waive its exclusive power over a federal enclave. The answer in Offutt was no; the answer the majority gives in this case is yes. I disagree with my brethren.
 
 
 47
 The majority defends its result in this case by citing cases that support the proposition that for Congress to consent to state regulation, "there must be a specific congressional deferral to state authority over federal property." The first case the majority discusses is Howard v. Commissioners, 344 U.S. 624, 73 S.Ct. 465, 97 L.Ed. 617 (1953). A close reading of this case, however, undercuts the majority's position. It is true that the statute at issue in Howard contained the words "Federal area." See id. at 627-28, 73 S.Ct. at 467. But the Court's examination of the statute did not turn on whether the words were specifically included; rather, it looked to see if the "right [to regulate] is specifically granted." Id. at 628, 73 S.Ct. at 467 (emphasis added). The majority also cites Evans v. Cornman, 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970), in support of its position. This case is inapposite because it involved an equal protection challenge to a state voting requirement. The issue of congressional consent to state regulation of a federal enclave is not addressed anywhere in the opinion. The words present in Evans[1] thus are purely incidental to the opinion. The two cases the majority opinion cites simply fail to support the holding that Congress must specifically include words such as "federal lands" or "federal enclave" in a statute to consent to state regulation.
 
 
 48
 The majority opinion also finds significant the omission from Sec. 8093 of any reference to the Competition in Contracting Act, 10 U.S.C. Secs. 2301-2316 (1988). It reasons that if Sec. 8093 were construed to apply to Ellsworth, the statute would, in effect, constitute a repeal by implication of the "extensive and carefully-crafted body of federal procurement law." The majority opinion quotes from the Act at length, and holds that applying Sec. 8093 to Ellsworth violates the mandate to procure through competitive bidding. In reaching this conclusion, however, the majority opinion disregards the introductory material to 28 U.S.C. Sec. 2304, which states in part: "(a)(1) Except as provided in subsections (b), (c), and (g) and except in the case of procurement procedures otherwise expressly authorized by statute, the head of an agency in conducting a procurement for property or services--...." (emphasis added). I believe Sec. 8093 is just such an express authorization, and therefore that no conflict with the Competition in Contracting Act exists.[2]
 
 
 49
 Finally, the circumstances surrounding Sec. 8093's enactment indicate its applicability to Ellsworth. As the Supreme Court noted in Leo Sheep Co. v. United States, 440 U.S. 668, 99 S.Ct. 1403, 59 L.Ed.2d 677 (1979), " 'courts, in construing a statute, may with propriety recur to the history of the times when it was passed; and this is frequently necessary, in order to ascertain the reason as well as the meaning of particular provisions in it.' " Id. at 669, 99 S.Ct. at 1405 (quoting United States v. Union Pac. R.R., 91 U.S. 72, 79, 23 L.Ed. 224 (1875)). The facts in this case show that Congress enacted Sec. 8093 seventy-seven days after the Supreme Court declined to review this court's decision in Weinberger. This temporal proximity, although not determinative of the issue of the proper construction of Sec. 8093, is further evidence of Congress' intent and supports the construction that Sec. 8093 applies to federal enclaves.
 
 
 50
 In sum, Sec. 8093 applies to the federal retail procurement of electricity at Ellsworth Air Force Base. The statute's plain language and legislative history, as well as the relevant Supreme Court precedent, supports this construction. The majority opinion does not proffer any cases that support the proposition that Congress must include words such as "federal lands" or "federal enclaves" to consent to state regulation of a federal enclave. Although the majority opinion states that if Congress intended to subject federal enclaves to state electrical utility regulations, Congress need only enact a law, this direction is superfluous, because Congress has done so already.
 
 
 
 *
 The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation
 
 
 [1]
 The Honorable Richard H. Battey, United States District Judge for the District of South Dakota
 
 
 [2]
 S.D.Codified Laws Ann. Sec. 49-34A-42 provides in part:
 Each electric utility shall have the exclusive right to provide electric service at retail at each and every location where it is serving a customer as of March 21, 1975.
 
 
 [3]
 Art. I, Sec. 8, cl. 17 provides:
 "[The Congress shall have Power to] exercise exclusive Legislat[ive] ... Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings."
 
 
 [4]
 The United States renewed its contract with Heartland until 1986, when the contract was awarded to a North Dakota entity, Basin Electric Power Cooperative. In 1987, the contract went back to Heartland, and was then extended for a one-year period on October 15, 1988. During the pendency of this appeal, the United States has again solicited the lowest bid for the supply of its overrun electricity, and on March 22, 1990, the contract was again awarded to Basin Electric Power Cooperative. Basin Electric is currently supplying Ellsworth with its overrun electricity
 
 
 [5]
 Continuing Appropriations Act, Fiscal Year 1988, Pub.L. No. 100-202, Sec. 8093, 101 Stat. 1329-79 (1987) ("section 8093"), provides:
 None of the funds appropriated or made available by this or any other Act with respect to any fiscal year may be used by any Department, agency, or instrumentality of the United States to purchase electricity in a manner inconsistent with State law governing the provision of electric utility service, including State utility commission rulings and electric utility franchises or service territories established pursuant to State statute, State regulation, or State-approved territorial agreements: provided, That nothing in this section shall preclude the head of a Federal agency from entering into a contract pursuant to 42 U.S.C. 8287; nor shall it preclude the Secretary of a military department from entering into a contract pursuant to 10 U.S.C. 2394 or from purchasing electricity from any provider when the utility or utilities having applicable State-approved franchise or other service authorizations are found by the Secretary to be unwilling or unable to meet unusual standards for service reliability that are necessary for purposes of national defense.
 
 
 [6]
 We have already noted the similarity in the analysis between the enclave clause and the supremacy clause. "They [both] illustrate that a state cannot diminish the constitutional authority of the United States government by regulating the parties with whom it may contract." Black Hills Power & Light Co. v. Weinberger, 808 F.2d 665, 669 n. 4 (8th Cir.), cert. denied, 484 U.S. 818, 108 S.Ct. 73, 98 L.Ed.2d 36 (1987)
 
 
 [7]
 The dissent misconstrues the scope of Offutt Hous. Co. v. County of Sarpy, 351 U.S. 253, 76 S.Ct. 814, 100 L.Ed. 1151 (1956), by broadly characterizing the issue decided as whether the words "federal lands" or "federal enclaves" need to be included in a statute in order to waive jurisdiction over a federal enclave. The Offutt opinion, however, is replete with language specifically limiting the decision to the facts of that case. For example, the Court states that the case "raises serious questions of state-federal relations with respect to taxation of private housing developments on Government-owned land." Id. at 256, 76 S.Ct. at 817. The Court noted that its function is to apply the general language of the challenged statute to "a specific problem." Id. at 260, 76 S.Ct. at 819. Furthermore, the Court determined that "the more persuasive construction of the statute, ... is that the States were to be permitted to tax private interests, like those of this petitioner, in housing projects located on areas subject to the federal power of 'exclusive Legislation.' " Id. Finally, the Court concluded that "[w]e hold only that Congress, in the exercise of this power, has permitted such state taxation as is involved in the present case." Id. at 260-61, 76 S.Ct. at 819 (emphasis supplied)
 Following this narrow holding, the Court considered the lessee's alternate argument that, in fact, the tax is actually borne by the Government, not the private lessee, or, in the alternative, that the Government has a substantial interest in the property and is thereby tangentially the object of the state regulation. After a lengthy discussion, the Court rejected the lessee's contention and concluded that the value of the buildings and improvements is attributable to the lessee's interest. If, as the dissent contends, the Court had made the broad pronouncement that Congress need not specifically and unambiguously defer its exclusive jurisdiction over a federal enclave, then the Offutt Court's careful examination of the real party subject to the tax is mere surplusage. We do not believe this to be the case, and instead view the Court's discussion as a clear demonstration of the important distinction between state regulation of a private interest on government land, as opposed to state regulation of the Government itself.
 To conclude, as does the dissent, that the Offutt holding broadly negates the requirement of specific and clear congressional deferral of its exclusive jurisdiction over federal enclaves, ignores prior precedential authority, as well as the plain language of the Offutt opinion.
 
 
 [8]
 Our decision herein is not affected by the Supreme Court's recent decision in North Dakota v. United States, --- U.S. ----, 110 S.Ct. 1986, 109 L.Ed.2d 420 (1990). In North Dakota, the federal government challenged North Dakota laws regulating liquor sold to military bases within the state. The regulations required that out-of-state suppliers who transfer liquor into the state affix a label to each bottle of liquor destined for delivery to a federal enclave and to file monthly reports documenting the volume of liquor imported into the state. See N.D.Admin.Code Secs. 84-02-01-05(1), 84-02-01-05(7)
 The two military bases at issue were federal enclaves, over which the United States and North Dakota exercise concurrent jurisdiction. The Supreme Court held that these state regulations were not invalid under the Supremacy Clause, notwithstanding a federal law directing that distilled spirits be "procured from the most competitive source, price and other factors considered." Pub.L. No. 99-661 Sec. 313, 100 Stat. 3853, 10 U.S.C. Sec. 2488(a).
 This decision is distinguishable from the instant case in at least two respects: (1) Although the regulations indirectly affect the federal government's liquor costs, they do not regulate the federal government directly, since they operate only against suppliers; (2) The United States and the State of North Dakota share concurrent jurisdiction over the military bases, in contrast to Ellsworth, which is under the exclusive jurisdiction of the United States.
 
 
 [1]
 "Congress has permitted the States to levy and collect their income, gasoline, sales, and use taxes--the major source of state revenues--on federal enclaves. See 4 U.S.C. Secs. 104-110. State unemployment laws likewise apply to persons who live and work in federal areas. See 26 U.S.C. Sec. 3305(d); 40 U.S.C. Sec. 290." Id. at 424, 90 S.Ct. at 1756
 
 
 [2]
 The majority opinion also places great emphasis on Sec. 8093's location in an appropriations bill. The implication of the majority opinion's argument is that such a location is unusual and makes the statute somehow less binding. An overview of Title VIII, of the Act of Dec. 22, 1987, Pub.L. No. 100-202, 101 Stat. 1329-62 to 1329-90, which contains Sec. 8093, reveals numerous examples of "substantive legislation" containing prefatory language either the same or very similar to that found in Sec. 8093, i.e., "None of the funds provided in this Act shall be available ..." and "No appropriation contained in this Act shall be available to fund any...."